# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EPHRAIM TEKLE, a minor, by and
through his Guardian Ad Litem,
LILY TEKLE,

   *Plaintiff-Appellant,*

    v.

UNITED STATES OF AMERICA; GARO
TOROSSIAN; KEITH BODEN; CHARLES
MCCALMONT; THOMAS JANKOWSKI;
DAVID M. HAWKES, all agents and
employees of the Internal Revenue
Service, an agency of the United
States of America,

   *Defendants-Appellees.*

No. 04-55026

D.C. No.
CV 01-3894 RSWL

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
October 19, 2005—Pasadena, California
Opinion Filed August 11, 2006
Opinion Withdrawn December 3, 2007

Amended Opinion Filed December 3, 2007

Before: Andrew J. Kleinfeld, A. Wallace Tashima, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Fisher;
Concurrence by Judge Kleinfeld

15517

**COUNSEL**

A. Clifton Hodges, Hodges and Associates, Pasadena, California, for the plaintiff-appellant.

Frank M. Travieso, Assistant United States Attorney, Los Angeles, California, for the defendants-appellees.

**ORDER**

Defendants-appellees' petition for panel rehearing is granted. The opinion and Judge Kleinfeld's opinion concurring the result filed on August 11, 2006, and reported at 457 F.3d 1088, are withdrawn and replaced by the amended opinion, Judge Fisher's opinion concurring in part and concurring in the judgment, and Judge Kleinfeld's opinion concurring in the result filed concurrently with this order.

The petition for rehearing en banc is denied as moot. No further petitions for panel rehearing will be entertained. Petitions for rehearing en banc may be filed with respect to the amended opinion.

**OPINION**

TASHIMA, Circuit Judge:

Ephraim Tekle ("Tekle"), a minor, by and through his mother and guardian ad litem, Lily Tekle, filed a complaint

against the United States and various individuals, seeking declaratory relief and damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, and for alleged civil rights violations, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The complaint stemmed from an incident at Tekle's home when federal agents arrested Tekle's parents. The district court granted summary judgment in favor of the individual defendants on the basis that they did not violate Tekle's constitutional rights and that, even if they had, they were entitled to qualified immunity. Because the liability of the United States was derivative of the liability of the individual defendants, the court also granted summary judgment in favor of the United States. Tekle appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## BACKGROUND[1]

In 1998, Tekle's parents, Solomon and Lily Tekle, were suspected of narcotics trafficking and tax-related offenses. Internal Revenue Service ("IRS") Special Agent Thomas Jankowski prepared a plan to execute search and arrest warrants at their home. Jankowski learned that the couple's three children, including then eleven-year-old Ephraim, lived at the home and that Lily took the children to school each morning.

---

[1]"Because this case arises in the posture of a motion for summary judgment we are required to view all facts and draw all reasonable inferences in favor of the nonmoving party," in this case, Tekle. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam); *see also Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (en banc) (accepting the plaintiffs' recitation of the facts because the case arose in the posture of a motion for summary judgment and involved issues of qualified immunity). We disagree with the government that Tekle has failed to produce any admissible evidence sufficient to create a genuine issue of material fact, pursuant to *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956 (9th Cir. 2004). In response to the government's filing of the declarations of its agents, Tekle filed his own deposition, as well as depositions of both his parents, with his opposition to the government's motion for summary judgment.

Jankowski thus planned to serve the warrants after Lily had taken the children to school.

On the morning of March 23, 1998, a team of approximately twenty-three agents gathered at an area away from the Tekle home for briefing.[2] Another team of agents arrested Lily without incident after she dropped off two of her children at school. The agents asked Lily for the garage door opener to her house, and she told them to be careful because her eleven-year-old son was at home and her husband recently had suffered a heart attack and undergone major heart surgery. The agents communicated by radio with the team of agents at the Tekle home and informed them of what Lily had told them.

At the Tekle residence, the agents announced the presence of law enforcement officers over a public address system. Jankowski also called Solomon Tekle on a cellular telephone, asking him to surrender himself at the front door.

Immediately prior to the agents' announcement, Tekle opened the garage door and exited the garage in order to take out the trash, unaware of the agents' presence. He was barefoot and was wearing a t-shirt and shorts. He saw numerous police cars and heard a "loud intercom" over which the officers were saying, "Young man, turn around and put your hands in the air." Because he did not realize they were speaking to him, he turned around and started running back to the house through the garage. The agents again told him to turn around with his hands up, and Tekle turned around and started walking out of the garage with his hands up.

One of the officers told Tekle to get on the ground, so he lay face down on the driveway. The officer held a gun to Tekle's head, searched him, and handcuffed him. The officer

---

[2]The agents were from the IRS, the DEA, and the Los Angeles Police Department.

pulled Tekle up from behind by the chain of the handcuffs and took him out to the sidewalk, where Tekle sat, still handcuffed, with his feet "in the gutter" until his father, Solomon, was brought out of the house in handcuffs, approximately fifteen minutes later.

After Solomon came out of the house, the officers removed the handcuffs from Tekle and sat him on a stool in the driveway, where about fifteen to twenty officers kept their guns pointed at him. Tekle asked if he could use the restroom, but one of the officers followed him to the restroom, keeping his hand on his gun, and would not let Tekle close the door, so Tekle returned to the driveway. One of the officers asked Tekle where his parents were from, and Tekle replied that he was born here but that his parents were from Ethiopia. The officer said, "Ethiopia is an f'n ugly country, and there's nothing to see there." When Tekle asked for his shoes, another officer threw the shoes on the ground and spat on them. Several hours later, one of Tekle's relatives came to the house to pick him up.

In his complaint, Tekle sought declaratory relief and damages.[3] He alleged claims for false arrest, assault and battery, and mental distress pursuant to the FTCA. He further alleged violations of his federal and state civil rights. The district court granted summary judgment in favor of the defendants, concluding that the force used was reasonable and, in the alternative, that Fourth Amendment law governing the agents' conduct was not clearly established at the time of the incident. Accordingly, it held that the agents were entitled to qualified immunity. The court also concluded that Tekle had not raised an issue of triable fact regarding the reasonableness of his

---

[3]After Tekle's first two complaints were dismissed without prejudice on procedural grounds with respect to the individually named defendants, he filed another complaint against them, and the two actions were consolidated under the original action, which included the United States as a defendant.

detention. The court entered judgment in favor of the individual defendants and the United States, and Tekle timely appealed.

## STANDARD OF REVIEW

The district court's grant of a motion for summary judgment is reviewed de novo. *Blanford v. Sacramento County*, 406 F.3d 1110, 1114 (9th Cir. 2005). "Viewing the evidence in the light most favorable to the nonmoving party, . . . and drawing all reasonable inferences in favor of that party, we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Galvin v. Hay*, 374 F.3d 739, 745 (9th Cir. 2004). In evaluating a claim of qualified immunity, we first must determine whether, when viewed in the light most favorable to Tekle, the alleged facts show a violation of a constitutional right. *Blanford*, 406 F.3d at 1114-15. If the answer is yes, we then must determine whether the constitutional right at issue was clearly established at the time of the alleged violation. *Id.* at 1115. " 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## DISCUSSION

"*Bivens* is a judicially created cause of action against federal officers arising under the United States Constitution." *Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991). FTCA actions, by contrast, are created by statute. "The FTCA provides a waiver of the United States government's sovereign immunity for tort claims arising out of the conduct of government employees acting within the scope of their employment." *Adams v. United States*, 420 F.3d 1049, 1051 (9th Cir. 2005). "The FTCA specifies that the liability of the United States is to be determined 'in accordance with the law

of the place where the [allegedly tortious] act or omission occurred.' " *Rhoden v. United States*, 55 F.3d 428, 430 (9th Cir. 1995) (per curiam) (quoting 28 U.S.C. § 1346(b)) (alteration in the original). California law therefore governs the United States' liability in Tekle's FTCA claim. *See Galvin*, 374 F.3d at 758 (applying California law to determine the liability of federal officers for false arrest); *Cervantes v. United States*, 330 F.3d 1186, 1188 (9th Cir. 2003) (same); *see also Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994) ("Liability is determined by the tort law of the state where the claim arose.").

## I.  *Bivens* Claims

Tekle alleges that the individual defendants used excessive force when they pointed a gun at his head and pointed guns at him for the duration of the incident, and that they subjected him to an unreasonable detention. We hold that Tekle has raised genuine issues of material fact regarding whether the officers' conduct violated his constitutional rights and therefore reverse the district court's grant of summary judgment in favor of defendants on Tekle's *Bivens* claims.

### A.  Excessive Force

**[1]** "[U]se of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 202. In determining whether the force used was reasonable, we must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Blanford*, 406 F.3d at 1115 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The legal framework is clearly established. The first factor in determining whether the force used was excessive is the severity of the force applied. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). The

second factor, and the most important, is the need for the force. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The amount of force used is " 'permissible only when a strong government interest *compels* the employment of such force.' " *Drummond*, 343 F.3d at 1057 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)). Factors to be considered in determining the need for the force include " 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Blanford*, 406 F.3d at 1115 (quoting *Graham*, 490 U.S. at 396).

Finally, we must balance the force used against the need, to determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). This determination

> "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. This is because police misconduct cases almost always turn on a jury's credibility determinations.

*Id.* at 853 (quoting *Graham*, 490 U.S. at 396) (internal citations omitted).

**[2]** We now apply the framework to the facts of this case. The first factor is the severity of the force. *Drummond*, 343 F.3d at 1056. We have held that the pointing of a gun at someone may constitute excessive force, even if it does not

cause physical injury. *See Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc). In *Robinson*, police were told that a man carrying a shotgun had shot two dogs and was yelling at someone. Robinson, the plaintiff, approached the police to explain the situation to them, but the officers pointed their guns at his head, handcuffed him, and shoved him into their car, refusing to listen to his explanation of the situation. He was released after fifteen to thirty minutes. We agreed with the Third Circuit that officers who "pointed guns at people not under suspicion, handcuffed them and detained them for 25 minutes could be liable for a Fourth Amendment violation" because the " 'use of guns and hand-cuffs must be justified by the circumstances.' " *Id.* at 1014 (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995)).

[3] Here, viewing the facts in the light most favorable to Tekle, approximately twenty-three armed officers saw a bare-foot, eleven-year-old boy, clad in shorts and a t-shirt, emerge from his home.[4] Although he tried to return to the house after

---

[4]There is no dispute that Tekle was eleven years old at the time of the incident. The government has attempted to portray Tekle as more threatening than he appeared. For example, Agent Jankowski described Tekle as a "young male, approximately five feet tall," in his declaration prepared for this litigation. However, in a Memorandum of Activity dated April 7, 1998, approximately two weeks after the incident, Jankowski stated that Tekle "appeared to be about 12 to 14 years old," and Agent David Hawkes similarly described Tekle as appearing to be between those ages in his April 2, 1998, Memorandum of Activity. These memoranda indicate that, although Tekle may have appeared slightly older than his actual age, it still was apparent to the officers at the time that Tekle was a child. Although Judge Kleinfeld states that the evidence was that Tekle was between five and six feet tall, the record actually indicates that, in preparation for this litigation, the government attempted to portray Tekle as more threatening than he appeared to them at the time of the incident. Nor is there any support whatsoever in the record for Judge Kleinfeld's specula-tion that the officers feared that Tekle could "run around the neighborhood stirring up older youths and adults to interfere." Kleinfeld concurring op. at 15553.

hearing the initial "intercom," he then stopped and cooperated. He did not attempt to flee, nor did he resist them, but he complied with their requests, lying face down on the driveway. He was unarmed.[5] The officers then held a gun to his head, searched him, handcuffed him, pulled him up from behind by the chain of the handcuffs, and sat him on the sidewalk, still handcuffed, with their guns pointed at him, for ten to fifteen minutes. Only after they removed his father from the home in handcuffs did they remove the handcuffs from Tekle. They then sat him on a stool, with their guns still drawn, for another fifteen to twenty minutes. We conclude under these circumstances that the amount of force used against Tekle constituted a " 'very substantial invasion of [his] personal security.' " *Id.* at 1015 (quoting *Baker*, 50 F.3d at 1193). Consequently, this factor weighs in favor of Tekle.

[4] Turning to the second and most important factor, we conclude that "the need for the force, if any, was minimal at best." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003). All the factors to be considered in determining the need for the force weigh in favor of a finding that the need for force was minimal. First, Tekle clearly was a child and was not the subject of the arrest warrant. Tekle was unarmed and vastly outnumbered and did not pose an immediate threat to the officers' safety. He did not actively resist arrest or attempt to flee.

---

More importantly, the agents knew that Solomon had an eleven-year-old child, and, when Lily was arrested, she told the arresting agents that her eleven-year-old son was at home. This information allegedly was conveyed to the team of agents at the Tekle home prior to the incident. For all these reasons and taking into account the summary judgment posture of the case, we assume throughout this opinion that Tekle clearly was a child and appeared to be approximately eleven to twelve years old to the officers at the scene.

[5]The government urged at oral argument that Tekle could have been armed. There is no evidence in the record, however, to support such an assertion, and there has never been any allegation that the officers thought Tekle was armed.

Under these circumstances, even if the officers needed to secure Tekle in order to execute the search and arrest warrants, it should have been apparent that this eleven-year-old boy did not pose a threat and that the need for force accordingly was minimal. *Cf. id.* (finding the force excessive where the officer threw the plaintiff to the ground and handcuffed her, despite the fact that she posed no safety risk and made no attempt to leave the property); *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th Cir. 2005) (stating that the governmental interests in using handcuffs were at a minimum when there was no indication that officers believed the suspects would flee or be armed), *cert. denied*, 126 S. Ct. 1331 (2006); *Wall v. County of Orange*, 364 F.3d 1107, 1111-12 (9th Cir. 2004) (reversing the grant of summary judgment where the deputy violently arrested the plaintiff, handcuffing his hands tightly, even though there was no probable cause for arrest and the plaintiff was following the deputy's instructions).

**[5]** Balancing the force used against the need, we conclude that, "when the disputed facts and inferences are treated in the manner required by law, a jury could properly find" that the force used was "greater than [was] reasonable under the circumstances." *Santos*, 287 F.3d at 853, 854. There were over twenty officers present at the scene, and Tekle was not suspected of any crime. He was cooperative and unarmed and, most importantly, he was eleven years old. A reasonable agent confronted with these circumstances should have known that there was no need to use guns and handcuffs. Yet, the officers kept Tekle handcuffed and pointed their weapons at him even after it was apparent that he was a child and was not resisting them or attempting to flee. Moreover, Tekle has alleged that an officer pulled him up from behind by the chain of the handcuffs, an act which, if true, could support a jury finding of excessive force. We understand that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary

in a particular situation." *Graham*, 490 U.S. at 396-97. None-theless, we are convinced, if only by the sheer number of offi-cers versus the one, clearly unarmed, barefoot child that a reasonable jury could find that the officers used excessive force.

**[6]** " '[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.' " *Wall*, 364 F.3d at 1111 (quoting *Saucier*, 533 U.S. at 201). "[I]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law." *Drummond*, 343 F.3d at 1060-61. The question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "[I]n the absence of binding prece-dent, we 'look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts.' " *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (quoting *Drummond*, 343 F.3d at 1060).

**[7]** We have held since 1984 that pointing a gun at a sus-pect's head can constitute excessive force in this circuit. *See Robinson*, 278 F.3d at 1014 (stating that "under more extreme circumstances the pointing of a gun has been held to violate even the more rigorous standard applicable before *Graham*, when plaintiffs were required to establish conduct so exces-sive that it 'shocked the conscience' ") (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1010 (9th Cir. 1984)); *see also Baldwin*, 418 F.3d at 970 (stating that officers "violated the civil right of the plaintiffs to be free from battery by gun-wielding officers, a right established in this circuit since 1984"). The plaintiffs in *McKenzie* were suspected of trying to sell stolen jewelry and of possibly being tied to a prior rob-bery and murder. The officers burst into the room with weap-ons drawn, forced the plaintiffs to the wall, handcuffed them,

threw them to the floor, and pressed their guns against the plaintiffs' heads, refusing at first to identify themselves as police officers. We found "ample basis for a jury to find the police officers' conduct excessive." *McKenzie*, 738 F.2d at 1011.

In *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), a police officer held a gun to the head of a nine-year-old and threatened to pull the trigger during a search of the child's residence. The officer argued that he was entitled to immunity because it was not clearly established at the time that it was an unconstitutional use of force for a police officer to point a gun at a resident's head during a lawful search of the residence. *Id.* at 293. The Seventh Circuit rejected this argument, stating that, although "[t]he level of generality at which the relevant legal 'rule' is identified cannot be so abstract as to convert the rule of qualified immunity into a rule of virtually unqualified liability," "this does not require a prior case that is 'precisely on all fours on the facts and law involved here.' " *Id.* (quoting *Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 676 (7th Cir. 1990)). The court then concluded that it was clearly established that the force used by the officer was constitutionally proscribed. *Id.* at 294.

**[8]** Similar to *McDonald*, Tekle was a minor at the time of the incident and "posed no threat to the safety of . . . any . . . officer present, was not actively resisting arrest or attempting to evade arrest by fleeing, and was not engaged in any assaultive behavior toward . . . the . . . officers." *Id.* at 292-93; *see also Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (holding that judgment as a matter of law was erroneously granted where the deputy sheriff grabbed a ten-year-old child out of a chair and dragged her into another room in the course of her father's arrest, even though she "was not under arrest and posed no threat to anyone"); *Baker*, 50 F.3d at 1193-94 (concluding that the plaintiffs had presented evidence sufficient to withstand summary judgment where officers pointed guns at the plaintiffs, including three minors, aged seventeen, seven-

teen, and fifteen, and handcuffed some of them for up to twenty-five minutes, where there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used"). *McKenzie*, *McDonald*, *Ikerd*, and *Baker* all were decided prior to 1998, the year of the events in this case. "[W]e conclude that the officers had 'fair warning' that the force they used was constitutionally excessive even absent a Ninth Circuit case presenting the same set of facts." *Drummond*, 343 F.3d at 1061 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *cf. McDonald*, 966 F.2d at 294 (reasoning that the officer "would have no reason to think that [the Seventh] Circuit would reject [the Third Circuit's] holding" regarding the reasonableness of his actions). Although there may not be a prior case specifically prohibiting the use of handcuffs and weapons by more than twenty officers to subdue an unarmed eleven-year-old boy who is not suspected of any wrongdoing and is cooperating with the officers, "*[a]ny* reasonable officer should have known that such conduct constituted the use of excessive force." *Drummond*, 343 F.3d at 1061.

**[9]** A reasonable officer would have known that the force used against Tekle violated his constitutional rights. *See, e.g.*, *id.* at 1061-62 (reversing the district court's grant of summary judgment in favor of the officers and remanding for trial because a reasonable officer would have known that pressing his weight on a person who was handcuffed and offering no resistance, constituted the use of excessive force, "even absent a Ninth Circuit case presenting the same set of facts"). We thus conclude that the district court erred in granting summary judgment in favor of the defendants on this claim.

## B. Unreasonable Detention

Tekle further contends that his detention was unreasonable, relying on *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994), in which we concluded that officers conducted a detention in connection with a search unreasonably, "by removing a

gravely ill and semi-naked man from his sickbed without providing any clothing or covering, and then by forcing him to remain sitting handcuffed in his living room for two hours," despite the fact that they had no reason to believe he had committed a crime or was armed. *Id.* at 876-77. We conclude that the way handcuffs were used on Tekle rendered his detention unreasonable.

**[10]** "An officer's authority to detain incident to a search is categorical . . . ." *Muehler v. Mena*, 544 U.S. 93, 98 (2005). "[P]olice do not, however, have unfettered authority to detain a building's occupants in any way they see fit." *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006). Rather, the detention must be conducted "in a reasonable manner." *Id.*; *see also Muehler*, 544 U.S. at 98-99 (stating that officers have the "authority to use *reasonable* force to effectuate the detention" of a building's occupants) (emphasis added); *Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir. 2003) (stating that, apart from police conduct that is per se unreasonable, we must balance privacy concerns and law enforcement concerns to determine if the detention was reasonable). "[D]etaining a person in handcuffs during the execution of a warrant to search for evidence is permissible, but only when justified by the totality of the circumstances." *Meredith*, 342 F.3d at 1062-63; *see also Robinson*, 278 F.3d at 1014 (agreeing with the Third Circuit that the use of guns and handcuffs must be justified by the circumstances).

In *Muehler*, the Supreme Court considered the reasonableness of the detention of an occupant of a house that was searched pursuant to a search warrant. Iris Mena, who was not suspected of criminal wrongdoing, rented a room in her house to a gang member who was suspected of involvement in a driveby shooting. Police obtained a search warrant for the home to search for weapons and evidence of gang membership. The officers placed Mena in handcuffs at gunpoint when they first entered the home, moved her into a converted garage with three other people found on the property, and

detained her in handcuffs throughout the two-to-three-hour search.

The Court concluded that the "use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion." *Muehler*, 544 U.S. at 99. The Court relied on the fact that "this was no ordinary search" because it involved "a search for weapons and a wanted gang member resides on the premises," making it an "inherently dangerous situation[ ]." *Id.* at 100. The Court also noted that "this case involved the detention of four detainees by two officers." *Id.* The governmental interests in detaining and using handcuffs thus were "at a maximum."**[6]** *Id.*

*Dawson* relied on *Muehler* to find reasonable the detention of a boardinghouse's tenants during a two-hour inspection by public health officials for rodent infestation. *Dawson*, 435 F.3d at 1066-70. We pointed to the fact that the landlord was associated with a man with a violent criminal history who previously had threatened inspectors, as well as to the fact that police did not know how many people were inside the building, concluding that "[a]llowing an unknown number of unidentified people to move about unsupervised during an involuntary inspection would dramatically increase the likelihood that an occupant could injure or kill an officer, or that an officer might mistakenly injure an occupant." *Id.* at 1067.

Significantly, *Dawson* did not involve either the use of handcuffs or children. And, although *Muehler* involved the

---

**[6]**Judge Kleinfeld asserts that this case is "analogous" to *Muehler*, characterizing *Muehler* as involving a "small, barefoot woman" being detained in handcuffs. Kleinfeld concurring op. at 15555. While both cases involve detention in handcuffs, the detention of a single, unarmed boy by over twenty armed officers simply is not analogous to the detention of four individuals (presumably adults, although the case does not specify) by only two officers.

use of handcuffs, they were used on adults in a situation where the officers were outnumbered by the detainees. Unlike both *Dawson* and *Muehler*, here, law enforcement personnel vastly outnumbered Tekle, more than twenty to one. It was apparent at the time that he was not the subject of the arrest warrant. Nor was there a suspicion that there were deadly weapons and a gang member thought to be "armed and dangerous" on the premises. *Muehler*, 544 U.S. at 95.

Tekle was barefoot, unarmed, clad in shorts and a t-shirt, and appeared to be approximately twelve years old. He was alone, and there were twenty-three armed officers. He was not resisting the officers but was lying face down on the ground with his arms stretched in front of him. Moreover, the officers already had searched Tekle and "uncovered no weapons or anything else to warrant further concern for their safety." *Bennett v. City of Eastpointe*, 410 F.3d 810, 837 (6th Cir. 2005). Yet Tekle remained handcuffed for fifteen to twenty more minutes, and an officer allegedly lifted him from behind by the chain of the handcuffs. We conclude that a reasonable jury could find that the officers' use of handcuffs rendered Tekle's detention unreasonable. *Cf. id.* (concluding that the use of handcuffs during a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), violated the Fourth Amendment rights of the plaintiffs, described as "youths," because the officers had conducted pat-down searches and uncovered no weapons and the officers had no reason to believe the youths were dangerous or would flee). We accordingly turn to whether it would be clear to a reasonable officer that his conduct was unlawful in light of existing law. *Saucier*, 533 U.S. at 202; *Drummond*, 343 F.3d at 1060-61.

We stated in *Meredith* that, as of July 10, 1998, "it was not clearly established in this (or any other) circuit that simply handcuffing a person and detaining her in handcuffs during a search for evidence would violate her Fourth Amendment rights." *Meredith*, 342 F.3d at 1063. None of the plaintiffs in *Meredith*, however, was an eleven-year-old child.

**[11]** Moreover, in *Franklin*, we stated that detentions of children raise particular concerns that must be assessed with the other circumstances. *Franklin*, 31 F.3d at 876. The Seventh Circuit's decision in *McDonald*, relying in part on the fact that the plaintiff was a child, was decided in 1992. *See McDonald*, 966 F.2d at 295; *see also Ikerd*, 101 F.3d at 435 (a Fifth Circuit case decided in 1996 also involving the use of excessive force against a child); *Baker*, 50 F.3d at 1193 (a Third Circuit case, deciding in 1995 that the use of guns and handcuffs during a twenty-five minute detention of seventeen- and fifteen-year-old children supported a finding that their constitutional rights were violated). The totality of the circumstances supports the conclusion that not only was Tekle's detention unreasonable, but a reasonable officer would have known that an eleven-year-old child who was unarmed, barefoot, vastly outnumbered, and was not resisting arrest or attempting to flee should not have been kept in handcuffs for fifteen to twenty additional minutes.

## II.  FTCA Claims[7]

In his complaint, Tekle alleged three tort claims: false arrest, assault and battery, and intentional infliction of emotional distress.[8] Generally, "the United States is liable 'to the

---

[7]Except for footnote 8, *infra*, Part II sets forth the views of Judge Tashima and does not constitute part of the majority opinion.

[8]The government argues that Tekle has waived his FTCA claim for failure to raise the issue in his opening brief. We acknowledge that Tekle has not based his claim on tort law, which is the applicable law. We note, however, that there are five pages of argument devoted to the district court's perceived error in granting summary judgment in favor of the United States on the FTCA claim. Moreover, the government is not prejudiced because it "thoroughly discussed the question in its own brief." *USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1278 (9th Cir. 1994). Contrary to Judge Kleinfeld's assertion that Tekle's argument in his brief deals with his *Bivens* claim, not his FTCA claim, Kleinfeld concurring op. at 15556, the brief clearly asserts that the district court erred in granting summary judgment in favor of the United States on his tort claims. *See*

same extent as a private individual under like circumstances.' " *Galvin*, 374 F.3d at 758 (quoting 28 U.S.C. § 2674). The FTCA provides an exception to the United States' liability for certain torts, including assault, battery, and false arrest. 28 U.S.C. § 2680(h). When such a tort is committed by a federal law enforcement officer, however, liability is restored. *Id.*

We previously have stated that " '[law enforcement] obligations make the law of citizen arrests an inappropriate instrument for determining FTCA liability.' " *Galvin*, 374 F.3d at 758 (quoting *Arnsberg v. United States*, 757 F.2d 971, 979 (9th Cir. 1985)) (alteration in original). Thus, when federal officers are involved, we have held that the United States' liability is determined by " 'the law governing arrests pursuant to warrants.' " *Ting*, 927 F.2d at 1514 (quoting *Arnsberg*, 757 F.2d at 979).

**[12]** The Supreme Court, however, recently held that the United States' liability under the FTCA is to be based on the state law liability of a private party, not of a state or municipal entity. *United States v. Olson*, 546 U.S. 43, 44-47 (2005). The issue in *Olson* was the liability of the United States for allegedly negligent inspections by federal mine inspectors. The

Appellant's Opening Br. at 24 (discussing the "liability placed upon the UNITED STATES in a tort claim"). His argument deals solely with the liability of the United States and therefore cannot be regarding the *Bivens* claim, but is meant to deal with the FTCA claim. *See Ting*, 927 F.2d at 1513 ("While *Bivens* is a judicially created cause of action against *federal officers* arising under the United States Constitution, . . . the FTCA imposes liability on the *United States government* for acts by its employees that constitute torts in the state where the conduct occurred.") (emphasis added). The failure to discuss the United States' liability under tort law appears to be due to counsel's failure to understand the law applicable to an FTCA claim. Because he raised the issue and the government is not prejudiced, we exercise our discretion to address the issue, especially in light of our holding that the district court erred in granting summary judgment in favor of the defendants on the *Bivens* claims.

Court reversed a line of Ninth Circuit precedent permitting liability under the FTCA where local law would make a state or municipal entity liable. *Id.* at 44. The Court stated in broad terms that the FTCA means what it says — "namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." *Id.* (quoting 28 U.S.C. § 1346(b)(1)).[9] The Court emphasized the "private person" language, rejecting the notion that the United States would be liable only if a state or municipal entity would be liable. *Id.* at 45-46.

The Court also examined the language making the United States liable " 'in the same manner and to the same extent as a private individual under *like circumstances*.' " *Id.* at 46 (quoting 28 U.S.C. § 2674). The Court rejected reading the words "like circumstances" too narrowly, by looking only at the liability of federal mine inspectors, rather than broadening the inquiry by examining the liability of private persons who conduct safety inspections. *Id.* at 46-47.

The Court thus stated in no uncertain terms that we erred by restricting the FTCA to the liability of government entities. Even if the conduct entails uniquely governmental functions, the court is to examine the liability of private persons in analogous situations. *Id.* at 46 (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955), for the holding that the FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA 'in the performance of activities which private persons do not perform' "). Judge Fisher's reliance on the Court's admonition to look further afield in order to limit the inquiry in the instant case to the lia-

---

[9] The exception to the exception, restoring liability when false arrest, assault, and battery are alleged against law enforcement officers, does not provide a different standard for liability. *See* 28 U.S.C. § 2680(h). It merely reverts to 28 U.S.C. § 1346(b), which means the United States' liability is based on a private person's liability. *Id.*

bility of federal law enforcement officers, accordingly, turns the Court's reasoning on its head.

Contrary to Judge Fisher's warning, taking *Olson* at its word does not bring the FTCA into conflict with 26 U.S.C. § 7608. Although § 7608 grants IRS agents the authority to execute and serve arrest warrants, the statute does not grant agents the authority to commit torts in the process of executing warrants. Holding federal law enforcement officials liable for torts committed while acting within the scope of the authority granted to them does not bring the FTCA into conflict with the statute granting them such authority. In fact, it is the very purpose of the FTCA to hold the United States liable for torts committed by a government employee "while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Thus, although Judge Fisher is correct that "§ 2680(h)'s law enforcement proviso was intended to provide remedies for victims of law enforcement *abuses*, not for the routine and lawful exercise of law enforcement privileges," Fisher concurring op. at 15550, this begs the question of whether the officers' actions were abusive or routine and lawful. *Olson* states in broad terms that the words of the FTCA "mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." *Olson*, 546 U.S. at 44.[10]

Finally, although this court did state in *Rhoden* that a California court would apply federal law to determine whether an arrest by a federal officer was privileged, the issue in *Rhoden* was "when and for how long a federal immigration agent may

---

[10]Moreover, nowhere in its pleadings in the district court or in its briefs in this court does the government raise the "privilege" under 26 U.S.C. § 7608 as a defense. Thus, the argument in Judge Fisher's concurring opinion that the rule of *Olson*, making the United States liable when local law would make a private person liable in tort, does not apply in the face of a federal "privilege" under § 7608 is advanced in spite of the failure of the government to raise the issue.

detain a potentially excludable alien, what procedures the agent must follow, and when and how soon after being detained a person must be brought before an immigration judge." 55 F.3d at 430. The district court had reasoned that California law did not address such questions and that the plaintiff accordingly could not bring an action under the FTCA. We held that this was error and that the liability of the United States should be determined by whether the immigration agents complied with applicable federal standards.[11] *Id.* at 431.

Generally, however, "[i]n assessing the United States' liability under the FTCA, we are required to apply the law of the state in which the alleged tort occurred." *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006). Thus, for example, in *Conrad*, we applied California law to a claim of malicious prosecution by an IRS agent because the claim was based on "actions and events occurring in California." *Id.*; *see also, e.g.*, *Galvin*, 374 F.3d at 758 (applying California law to an FTCA claim for false arrest by federal law enforcement officers); *Cervantes*, 330 F.3d at 1188 (applying California law to FTCA claims for false arrest and false imprisonment by customs agents)[12]; *Ting*, 927 F.2d at 1513 (holding that "California law governs the United States' liability in this FTCA action" for, *inter alia*, assault and battery and false arrest by federal agents); *accord Kikumura v. Osagie*, 461 F.3d 1269, 1299-1301 (10th Cir. 2006) (applying Colorado law in an FTCA claim involving federal prison officers); *Dalrymple v. United States*, 460 F.3d 1318, 1327 (11th Cir. 2006) (stating that the violation of an internal policy of the INS did not create a cause of action under the FTCA unless the conduct was "independently tortious under applicable state law," and

---

[11]Moreover, of course, *Rhoden* was decided well before we had the guidance of *Olson*.

[12]*Cervantes* stated that California law was applicable and cited California law, but then cited federal law for the determination that probable cause existed for the arrest. *See Cervantes*, 330 F.3d at 1188.

applying Florida law to determine whether federal agents' actions were privileged in an excessive force claim); *Harris v. United States*, 422 F.3d 322, 327-30 (6th Cir. 2005) (relying on Ohio law to determine whether probable cause existed in an FTCA claim that DEA agents assaulted or maliciously prosecuted the claimant); *Williams v. United States*, 242 F.3d 169, 172-73 (4th Cir. 2001) (rejecting the argument that federal law applied to an FTCA claim involving a hospital that was run by the United States on a Cherokee reservation, and citing cases for "the universally accepted position that 'law of the place,' as used in the FTCA, refers to state and local law, not federal law"); *Tindall ex rel. Tindall v. United States*, 901 F.2d 53, 55 (5th Cir. 1990) (per curiam) (applying Mississippi law to an FTCA action involving agents of the Bureau of Alcohol, Tobacco, and Firearms).[13]

---

[13]Moreover, the case on which *Rhoden* relied to state that the court must include federal law in assessing the United States' liability under the FTCA was *Richards v. United States*, 369 U.S. 1 (1962), in which the question was what law to apply in an FTCA action where the negligent act occurred in one state but the resultant injury and death occurred in a different state. *Id.* at 2. *Richards* concluded that "a reading of the [FTCA] as a whole, with due regard to its purpose, requires application of the whole law of the State where the act or omission occurred," including the choice-of-law rules of the state where the negligence occurred. *Id.* at 11. Thus, the question was whether the FTCA required the application of "(1) the internal law of the place where the negligence occurred, or (2) the whole law (including choice-of-law rules) of the place where the negligence occurred, or (3) the internal law of the place where the operative effect of the negligence took place." *Id.* at 3. There was no question that state law applied. *See id.* at 14 n.29 ("In fact, despite the ambiguity that exists in the [legislative] history due to the fact that Congress did not specifically consider the choice-of-laws problem, the legislative material indicates that Congress thought in terms of state law being applicable."). Similarly, in the other case cited by *Rhoden*, *Caban v. United States*, 728 F.2d 68 (2d Cir. 1984), the Second Circuit did not merely state as a general principle that federal law applied to FTCA claims of negligence, invasion of privacy, and false imprisonment by INS agents. The court undertook a careful examination of New York's law of false imprisonment and concluded that, "[i]n light of New York's policy of assessing a defendant's actions in accordance with the law applicable to his conduct, we infer that the New York state courts would look to federal principles in determining the standard by which INS officials' detention of a would-be entrant are to be judged." *Id.* at 73 (citation omitted).

For these reasons, *Olson* requires us to examine the law regarding the liability of a private person for false arrest, assault and battery, and intentional infliction of emotional distress.

## A. False Arrest

Under California law, false arrest, or false imprisonment, is "the unlawful violation of the personal liberty of another." Cal. Penal Code § 236; *see Collins v. City & County of S.F.*, 123 Cal. Rptr. 525, 526 (Ct. App. 1975) (stating that false arrest is "but one way of committing a false imprisonment, and they are distinguishable only in terminology"). "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 95 Cal. Rptr. 2d 316, 323 (Ct. App. 2000).

[13] A private person may make an arrest, which is "taking a person into custody, in a case and in the manner authorized by law." Cal. Penal Code § 834.

> A private person may arrest another: 1. For a public offense committed or attempted in his presence. 2. When the person arrested has committed a felony, although not in his presence. 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it.

Cal. Penal Code § 837. While a law enforcement officer may arrest a person without a warrant when he has probable cause to believe that the arrestee committed a misdemeanor in his presence, a private person may only arrest someone for a misdemeanor when the offense actually has been committed or attempted in his presence. *Hamburg v. Wal-Mart Stores, Inc.*, 10 Cal. Rptr. 3d 568, 580 (Ct. App. 2004). Reasonable cause

to believe that a misdemeanor has been committed is not sufficient. *Id.* at 581. When a private person is entitled to make an arrest, he is entitled to use reasonable force to detain the person. *People v. Fosselman*, 659 P.2d 1144, 1148 (Cal. 1983) (en banc); *see also People v. Garcia*, 78 Cal. Rptr. 775, 779 (Ct. App. 1969) (stating that when a private citizen was assaulted in the course of effecting a citizen's arrest, he was "justified in using such force as was reasonable for defendant's arrest and detention").

**[14]** Here, there is no evidence that the officers had any reason to believe that Tekle had committed a misdemeanor in their presence. Moreover, as discussed *supra*, based on the evidence provided by Tekle, a jury could find that the force used to detain him was not reasonable. Tekle accordingly has raised genuine issues of material fact regarding the officers' liability for false arrest. We therefore reverse the district court's grant of summary judgment on Tekle's false arrest claim.

## B.  Assault and Battery

Tekle's second allegation under the FTCA was that the officers assaulted him "by willfully and maliciously pointing a loaded firearm at [him] and threatening to shoot him." He further alleged that they committed battery "by placing handcuffs upon him, pushing him to the ground and forcing him to lay [sic] down and to sit with the handcuffs still on for an appreciable period of time."

Assault and battery are defined in the California Penal Code. Assault is the "unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Cal. Penal Code § 240. "A battery is any willful and unlawful use of force or violence upon the person of another." Cal. Penal Code § 242. "Harmful or offensive contact, intentionally done, is the essence of battery, while apprehension of

that contact is the basis of assault." 5 B.E. Witkin, SUMMARY OF CAL. LAW, *Torts* § 383 (10th ed. 2005) (citations omitted).

To establish civil assault, Tekle would need to establish that (1) the officers threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to him that they were about to carry out the threat; (3) he did not consent to the conduct; (4) he was harmed; and (5) the officers' conduct was a substantial factor in causing the harm. *See Judicial Council of Cal., Civil Jury Instructions* No. 1301 (2006) (listing the elements of an assault claim). Tekle testified that, while he was lying on the ground, an officer placed a gun to his head and then handcuffed him. He also stated that the officers had "all sorts of different guns, big ones and small ones, pointing at [him]" while he was sitting on the stool in the garage. Five years after the incident, he still had flashbacks, insomnia, and depression, and he had been treated by two psychiatrists and two psychologists. He further testified that, although he has never committed a crime, he still felt nervous whenever he saw a police officer.

The elements of a battery claim in California are that (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury, damage, loss or harm to the plaintiff. *Cole v. Doe 1 thru 2 Officers of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005). According to Tekle's deposition, an officer handcuffed him while he was lying face down on the ground and that he then picked him up by the chain of the handcuffs, cutting his skin.

**[15]** Over twenty armed officers encountered a barefoot, unarmed eleven-year-old boy who was not resisting them. Tekle testified that the officers continued to keep their guns trained upon him throughout the incident and that one officer picked him up from behind by the chain of the handcuffs. He certainly did not consent to the conduct, and he has alleged

that he suffered harm. We conclude that Tekle has raised a genuine issue of material fact as to whether the officers may be liable for assault and battery. We therefore reverse the district court's grant of summary judgment on this claim.

## C.   Intentional Infliction of Emotional Distress

Tekle's third FTCA claim was for intentional infliction of emotional distress. The elements of a prima facie case of intentional infliction of emotional distress in California are " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982) (quoting *Cervantez v. J.C. Penney Co.*, 595 P.2d 975, 983 (Cal. 1979)). In order to be considered outrageous, the conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal quotation marks omitted). Where reasonable persons may differ, the trier of fact is to determine whether " 'the conduct has been sufficiently extreme and outrageous to result in liability.' " *Cross v. Bonded Adjustment Bureau*, 55 Cal. Rptr. 2d 801, 811 (Ct. App. 1996) (quoting *Molko v. Holy Spirit Ass'n for the Unification of World Christianity*, 762 P.2d 46, 63 (Cal. 1988) (en banc)).

In *Cross*, the court concluded that reasonable minds could differ as to whether the defendant's conduct was sufficiently extreme and outrageous where the defendant, a collection agency, made affirmative misrepresentations to the plaintiffs who hired it and persuaded the plaintiffs to accept $40,000 on a judgment worth over $250,000. *Id.* The court stated that the agency's actions "were intentional and done with the foreseeable consequence that the [plaintiffs] would suffer severe emotional distress once they discovered the truth." *Id.*

**[16]** The district court here concluded that the agents did not engage in extreme and outrageous conduct. We disagree that such a conclusion can be reached on these facts as a matter of law. In addition to testifying that the officers kept their weapons pointed at him and picked him up off the ground by the chain of the handcuffs, Tekle also testified that an officer made disparaging remarks about Ethiopia. When Tekle asked a different officer if he could put on some shoes, the officer threw Tekle's shoes at him and spit on them. In light of the conclusion in *Cross* that a collection agency's abuse of its fiduciary duty, which adversely affected the plaintiffs' financial interests, could support a claim for intentional infliction of emotional distress, we conclude that reasonable minds could differ as to whether the conduct alleged here by Tekle was sufficiently extreme and outrageous to support such a claim. We therefore reinstate Tekle's intentional infliction of emotional distress claim.

## CONCLUSION

Viewing the facts and drawing all inferences in Tekle's favor, we conclude that the alleged facts show a violation of Tekle's constitutional rights. We further conclude that a reasonable officer should have known that it was constitutionally excessive to use such force and to use the handcuffs in the manner alleged against an unarmed eleven-year-old child who was fully complying with the officer's requests. We therefore reverse the grant of summary judgment in favor of the officer-defendants on Tekle's *Bivens* claims. Because the grant of summary judgment in favor of the United States was predicated on the district court's erroneous conclusions regarding the excessive force and unreasonable detention claims, we also reverse the grant of summary judgment in favor of the United States on the FTCA claims. We remand all claims to the district court for further proceedings.

**REVERSED and REMANDED**.

FISHER, Circuit Judge, concurring in part and concurring in judgment:

I concur in Part I of Judge Tashima's opinion. I write separately with regard to Part II because I do not believe the FTCA exposes federal law enforcement officers to tort liability when they are acting within the confines of the special law enforcement privileges conferred upon them by other federal statutes.

## I.

I agree that *United States v. Olson*, 546 U.S. 43 (2005), undermines the prior rule in this circuit, first articulated in *Arnsberg v. United States*, 757 F.2d 971, 978-79 (9th Cir. 1985), that the unique obligations of law enforcement officials "make the law of citizen arrests an inappropriate instrument for determining FTCA liability" and thus "the law governing arrests pursuant to warrants" defines the standard of care. *See id. Arnsberg*'s conclusion was premised upon 28 U.S.C. § 2674, which makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." We held that because federal law enforcement officers arrest suspects pursuant to their unique governmental duties, "a private citizen making a citizen's arrest does not act under 'like circumstances' required by § 2674." *Arnsberg*, 757 F.2d at 979 (citing *Caban v. United States*, 728 F.2d 68, 73-74 (2d Cir. 1984)). *Olson* rejected this type of reasoning, holding that "like circumstances do not restrict a court's inquiry to the *same circumstances*," and that tort law governing the conduct of private parties — not governmental entities — should supply the liability standard in FTCA suits involving unique governmental functions. *Olson*, 546 U.S. at 46-47 (internal quotation marks omitted, emphasis in original).

Even though law enforcement officers' unique governmental function in making arrests would not in general avoid anal-

ogizing to the law of citizen arrests, there is a second and independent basis for treating officers differently in an FTCA suit such as this one. Specifically, *federal law* grants law enforcement officials *special privileges* that allow law enforcement officers to do their jobs without violating civil and criminal sanctions that would otherwise apply. These privileges authorize federal law enforcement officers, acting within lawful bounds applicable to such officers, to execute search warrants on private property without committing the tort of trespass, to make valid arrests without committing the tort of false arrest and to use reasonable force in arresting suspects without committing the tort of battery. These same acts if done by private parties would often not be privileged from civil tort liability.

*Olson* could be read to support the conclusion that law enforcement privileges should not be recognized in FTCA suits, and that federal officers are left only with those privileges available to private citizens such as the citizen's arrest privilege. But I would read *Olson*'s instruction that "like circumstances do[es] not restrict a court's inquiry to the *same circumstances*, but require[s] it to look further afield," *Olson*, 546 U.S. at 46 (emphasis in original), to provide courts with enough flexibility to preserve law enforcement privileges. Because *Olson* did not involve such privileges, and because the FTCA's text does not clearly foreclose their availability, I would not reach out to construe *Olson*'s definition of "like circumstances" to override them.

Adopting this construction avoids creating tension between the FTCA and other provisions of federal law. In this case 26 U.S.C. § 7608(a)(2) accorded the IRS agent defendants the privilege to "execute and serve search warrants and arrest warrants." To hold that the FTCA makes IRS officers liable even when acting within the scope of this federal privilege would bring the FTCA into conflict with § 7608(a)(2), whereas the two statutes could easily be harmonized by reading the FTCA to impose liability only when the officers have

exceeded the bounds of the privilege. *See California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012 (9th Cir. 2000) ("[I]t is a well established axiom of statutory construction that, whenever possible, a court should interpret two seemingly inconsistent statutes to avoid a potential conflict.").

Construing the FTCA as preserving federal law enforcement privileges would also avoid an absurd result: that federal officers acting lawfully may nonetheless be held civilly liable if they do not conform their conduct to what is required of private citizens. *See United States v. Tatoyan*, 474 F.3d 1174, 1181 (9th Cir. 2007) ("Statutes should be read to avoid . . . absurd results."). Congress could have explicitly waived federal law enforcement privileges when it singled out federal law enforcement officials for removal from the protection of the FTCA's intentional tort exception. *See* 28 U.S.C. § 2680(h). We have held, however, that § 2680(h)'s law enforcement proviso was intended to provide remedies for victims of law enforcement *abuses*, not for the routine and lawful exercise of law enforcement privileges. *See Orsay v. United States Dep't of Justice*, 289 F.3d 1125, 1134-35 (9th Cir. 2002) (citing S. Rep. No. 93-588 (1973), *reprinted in* 1974 U.S.C.C.A.N. 2789, 2792 (1974)). Absent a clear expression by Congress on the subject, we should not abridge statutorily conferred federal law enforcement privileges.[1]

One final element of the FTCA's text solidifies that law enforcement privileges survive the Act. The statute requires us to apply "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). We have understood this

[1]Far from expressing congressional intent to eliminate federal law enforcement privileges, the FTCA's text might be understood to support the preservation of those privileges by providing that "[w]ith respect to any [FTCA] claim . . . the United States shall be entitled to assert any defense . . . to which the United States is entitled." 28 U.S.C. § 2674. The government has not argued here that federal law enforcement privileges fit within this provision, however, and I therefore do not rely on it.

to mean that we apply the law a state court would apply in analogous circumstances, including federal law if the state's choice-of-law rules would so provide. *See Rhoden v. United States*, 55 F.3d 428, 431 (9th Cir. 1995) (per curiam). Thus we have allowed defendants in FTCA suits to assert the privileges that a state court would recognize in an analogous state law tort action. For example, in *Rhoden* we held that a California court would apply federal law to determine whether federal immigration officials' detention of the plaintiff was privileged against a claim of false imprisonment under California law. *Id.*; *accord Trenouth v. United States*, 764 F.2d 1305, 1307 (9th Cir. 1985). We held that the defendants would be liable only if the detention violated applicable federal statutes or the Constitution. *See Rhoden*, 55 F.3d at 431, 432 n.5. We reached a similar conclusion in *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004), although by applying state rather than federal privilege law. We looked to California Penal Code § 847(b)(1), which makes both state *and* federal officers immune from civil suits for false imprisonment where the detention was the result of a lawful arrest.[2] *See Galvin*, 374 F.3d at 758. Despite the slight tension between *Rhoden* and *Galvin* regarding which body of privilege law should apply, the principle that California courts would apply a *law*

---

[2]The statute provides in relevant part:

There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer or *federal criminal investigator or law enforcement officer* . . . acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest under any of the following circumstances:

(1) The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful.

(2) The arrest was made pursuant to a charge made, upon reasonable cause, of the commission of a felony by the person to be arrested.

Cal. Penal Code § 847(b) (emphasis added).

*enforcement* privilege (not the citizen's arrest privilege) is set-
tled — and *Olson* does not clearly unsettle it. *Cf. Miller v.
Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (hold-
ing that a three-judge panel may overrule prior precedent only
"where the reasoning or theory of our prior circuit authority
is *clearly irreconcilable* with the reasoning or theory of inter-
vening higher authority" (emphasis added)).

I would therefore hold that federal officers should not be
held liable under the FTCA if they are acting within the scope
of a privilege conferred by another federal statute.

## II.

Our holding that a rational jury could conclude that Tekle's
detention was constitutionally unreasonable applies with
equal force to Tekle's FTCA claim of false arrest. *See Rho-
den*, 55 F.3d at 432 n.5 (noting that the same conduct might
give rise to both FTCA and *Bivens* actions). Tekle accord-
ingly has raised genuine issues of material fact regarding
whether the detention was made "without lawful privilege."
*Cf. Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496
(2000) (affirming defendant's demurrer because plaintiffs
"failed to allege facts establishing that the conduct of which
they complain was not lawfully privileged"); *see also Rhoden*,
55 F.3d at 430 ("Once the plaintiff has proven the elements
of the tort, the defendant has the burden to establish that the
detention or arrest was legally justified."). I therefore agree
that the district court's grant of summary judgment on that
claim should be reversed.

Similarly, issues of fact remain regarding whether the offi-
cers acted lawfully in pointing a gun at Tekle's head and pick-
ing him up by the chain of his handcuffs. Therefore I agree
that the district court's grant of summary judgment on Tekle's
assault and battery and emotional distress claims should be
reversed.

KLEINFELD, Circuit Judge:

I concur in the result.

I agree that pointing guns at the boy amounted to the use of excessive force under well-established precedent, so the officers who did so lack qualified immunity.[1]

Regarding the handcuffs, I would also reverse, but more narrowly.

A reasonable officer could believe that the boy could interfere with legitimate law enforcement in at least two ways. He could leap on the officers or run in front of them as they tried to control his father. Though only eleven, the evidence was that he was between five and six feet tall. Alternatively, he could run around the neighborhood stirring up older youths and adults to interfere. He had already run back toward the house in violation of the officers's command, "Young man, turn around and put your hands in the air." His youth might make him less physically dangerous, but more impulsive and energetic than an adult, and he was not a small child. It was not unreasonable for the officers to believe that he might interfere with their legitimate activities.[2]

I would reverse the district court on only one aspect of the use of the handcuffs: lifting the boy to his feet by the handcuffs which were fastened behind him. No law enforcement purpose has been offered to justify that sadistic bit of bullying. Though there is no case holding that pulling an unresisting non-suspect to his feet by handcuffs fastened behind him amounts to the use of excessive force, the cases do establish

---

[1]*See Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002).

[2]*See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

that the needless and wanton infliction of pain during a search or arrest violates the Constitution.[3] The proposition that police may not inflict pain on non-suspects detained during a search, in the absence of any law enforcement reason, should be so obvious to reasonable officers that qualified immunity cannot shield them. A policeman ought to know that he is not constitutionally entitled to hurt people for no reason.[4]

Though the majority's holding is not clear, it seems to be that (1) keeping the boy handcuffed for fifteen or twenty minutes after the officers had searched him and found no weapons was excessive, and (2) this is so well established that any reasonable officer ought to know it, so the officers lacked qualified immunity. The opinion appears to hold that even though the boy's father, for whom the warrant had been issued, had not yet been handcuffed and brought outside, the officers should have removed the handcuffs from his son once they ascertained that the son was not armed.

The majority errs in two respects. First, it was not unconstitutional to keep the boy handcuffed while the warrant was still being executed. We made the same mistake in *Mena v. City of Simi Valley,*[5] and the Supreme Court corrected it in *Muehler v. Mena.*[6] Although the small, barefoot woman in *Muehler* was not herself a threat, the Court held that her "detention in handcuffs for the length of the search" was constitu-

---

[3]*See, e.g.*, *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (holding that forcibly throwing a woman to the ground and twisting her arms while handcuffing her amounted to excessive force because it was unnecessary).

[4]*See, e.g.*, *Headwater Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002).

[5]*Mena v. City of Simi Valley*, 332 F.3d 1255 (9th Cir. 2003) *rehearing and rehearing en banc denied*, 354 F.3d 1015 (9th Cir. 2004) (Kleinfeld, J., dissenting).

[6]*Muehler v. Mena*, 544 U.S. 93 (2005).

tionally permissible.[7] The search in *Muehler* was not of the woman, but of the residence.

The cases are analogous. Under *Muehler*, the majority errs in limiting the duration to the search of the boy, as opposed to execution of the search warrant for the home and arrest warrant for the father. The Court rejected our view that the two or three hour duration of the handcuffing in *Muehler* made it unconstitutional, yet here we hold that, as soon as the officers knew the boy was unarmed they had to take off the handcuffs, even though the search and arrest were still ongoing. The large number of officers who supposedly had their guns pointed at the boy does not justify requiring the officers to remove the handcuffs. The point was to control the boy and prevent him from making trouble, not to shoot him if he did make trouble. As we held in *Dawson v. City of Seattle*, "*Muehler* confirms an officer's authority to detain a building's occupants during a search so long as the officer conducts the detention in a reasonable manner."[8]

The majority goes on to deny qualified immunity for keeping the handcuffs on after the boy was found to have no weapons. Such a denial of qualified immunity requires not only that it was unconstitutional to keep him handcuffed until the house was searched and his father was arrested, but also that any reasonable officer should have known that it was unconstitutional.[9] This strikes me as bizarre, because no case supports the proposition that keeping an individual handcuffed during a search is unconstitutional except for our decision[10] reversed in *Muehler*.[11]

---

[7]*Id.* at 95.

[8]*Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006).

[9]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that government officials are entitled to qualified immunity in performing their discretionary functions unless their actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known").

[10]*Mena v. City of Simi Valley*, 332 F.3d 1255 (9th Cir. 2003).

[11]*Muehler v. Mena*, 544 U.S. 93 (2005).

We should not reach the Federal Tort Claims Act issues, because Tekle's brief does not raise them.[12] He argues exclusively that the officers violated his constitutional rights, not that they violated his state law rights. In footnote 8, the majority provides a factually mistaken justification for reaching the Federal Tort Claims Act: "there are five pages of argument devoted to the district court's perceived error in granting summary judgment in favor of the United States on the FTCA claim."[13] Tekle's argument at pages 23-24 of his opening brief, cited in the majority opinion at footnote 8, is that federal liability "would have to stem from the actions of its agents," and the agents committed "clear violations of EPHRAIM's constitutional rights." That is a *Bivens* claim, not a Federal Tort Claims Act claim.[14]

After setting out the facts and general principles of law on the first fourteen pages of the brief, the appellant argues at pages 15 through 28 that the individual defendants and the United States government violated the constitutional rights of EPHRAIM and qualified immunity does not apply. The

---

[12]*Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.").

[13]Judge Tashima and I have been unable to agree on whether the appellant's brief fairly raises the FTCA theory. I have attached as an appendix to this dissent a statement of issues and the five pages of argument that Judge Tashima thinks raise the claim, and that I think do not raise the claim. There is a point to the doctrine that a claim not raised in the appellant's brief is waived, and the point is not just to simplify an appellate court's work. Rather, there is a fairness problem, perhaps a due process problem, if an appellee loses an appeal on a theory that came from a judge's chambers rather than an appellant's brief.

[14]*Compare* 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the *law of the place where the act or omission occurred*") (emphasis added), *with Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396-97 (1971) (holding that claim for damages may be allowed where agents of the United States violated individual's *constitutional rights*).

remaining two pages of the brief, 28-29, are a conclusion arguing that the plaintiff's due process rights under the Constitution were violated and there is no entitlement to immunity. Appellant does not argue that anyone violated state tort law. True, the government argues that it did not violate state tort law, but the appellant is the master of the appeal and chose not to make the argument that the government responded to. There is no reply brief. I am mystified about why we are issuing three different opinions on an issue that appellants chose not to put before us.

Were we to reach the Federal Tort Claims Act issues, I agree with Judge Fisher that the Federal Tort Claims Act does not expose federal law enforcement officers to liability when they are acting within the confines of the special law enforcement privileges conferred upon them by other statutes. However, I disagree with Judge Fisher's conclusion that Tekle's FTCA claim for false arrest presents genuine issues of material fact.