OPINION OF THE COURT
JOHN R. GIBSON, Senior Circuit Judge:
Inez Baker, her two children, Corey and Tiffany Baker, and her foster daughter, Jac-quine Anderson, appeal from a summary judgment against them in their 42 U.S.C. § 1983 (1988) claim against Monroe Township, Robert Armstrong, a Monroe Township police officer, and numerous John Doe defendants who were police officers or federal Drug Enforcement Agency agents. The Baker family alleges illegal search and seizure of their persons and property and use of excessive force, which occurred as the family group approached the home of Mrs. Baker’s son, Clementh Griffin, just as police were commencing a drug raid there. The district court entered judgment for Monroe Township and for Armstrong, holding that the Bakers made no showing that either of these defendants was legally responsible for any violation of the Bakers’ rights that may have occurred. The district court also refused to allow the Bakers to amend their complaint to correct the names of the John Doe defendants, and refused to reconsider the summary judgment ruling based on an affidavit that was filed out of time under the local rules. We reverse and remand on the issue of whether the Bakers showed evidence that could render Armstrong personally liable for the alleged civil rights violations and also remand for consideration of whether Tiffany Baker should be permitted to amend to correct fictitious names.
Around 8:30 on the evening of Friday, June 1, 1990, Mrs. Baker, Corey, Tiffany, and Jacquine were approaching the home of Clementh Griffin, Mrs. Baker’s son, and his girlfriend, Cheryl Woods, who had invited them to dinner. It was still light outside, though dusk. At the same time, police from three jurisdictions were launching a drug raid on the same apartment, authorized by a “no-knock” warrant.[1] As the Bakers walked *1189 up to the door, they were suddenly surprised by officers running past them with guns in their hands, shouting, “Get down.” Some of the officers (including Armstrong) ran directly into the house, but others forced the Bakers down to the ground. The Bakers testified that the officers pointed guns at them, handcuffed them and left some of them handcuffed for as much as twenty-five minutes, searched Corey Baker, and emptied Mrs. Baker’s pocketbook onto the ground outside the apartment. After the Bakers identified themselves as relatives of Clementh Griffin, the police released them.
The Bakers brought this action under 42 U.S.C. § 1983, alleging, inter alia, violations of their Fourth Amendment rights by illegal seizure and use of excessive force. They specified only Robert Armstrong and Monroe Township as defendants, using fictitious names for sixteen other defendants whom they identified as assisting in the raid.
Armstrong and Monroe Township moved for summary judgment. The district court held that, assuming the Bakers’ Fourth Amendment rights were violated, the Bakers made no showing that Armstrong either committed the violations personally, directed someone else to commit them, or had knowledge of the violations and acquiesced in them. Instead, the court stated, the evidence indicated that Armstrong was inside the apartment while the alleged violations took place outside the apartment. Moreover, there was no evidence that Armstrong should have trained the other officers to behave differently, for though he was in charge of this particular raid, the other men were employees of the federal Drug Enforcement Agency and the Gloucester County Prosecutor’s office, whom Armstrong could expect to be adequately trained. Since Armstrong was the only Monroe Township official involved in the raid, the district court found no causal link between anything the Township did or did not do and the harm alleged.
The Bakers then sought leave to amend their complaint to correct the fictitious names of several of the officers they allege participated directly in the rough treatment. The Bakers brought this suit on June 1,1992, the last day before expiration of the two-year statute of limitations. Despite having received in March 1993 the names of the officers involved in the raid, the plaintiffs did not move to amend their complaint to correct the fictitious names until after the district court had entered summary judgment against them on November 5, 1993. At that point, the district court ruled that the Bakers had not made the requisite showing of diligence under New Jersey law, see Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 299 A.2d 394 (1973), and that state law would not permit the relation-back of the Bakers’ amended complaint. Their claims would be time-barred, and so the district court denied the Bakers’ motion to amend their complaint.
*1190 The Bakers moved for reconsideration of the summary judgment against them, arguing that they asserted state law claims that should not have been dismissed and that the court erred in its ruling on the section 1983 claims. About three weeks after their motion for reconsideration, they produced for the first time the affidavit of Clementh Griffin, containing evidence which was relevant to the elements the district court earlier held were not established. The court ruled that the Bakers filed their motion for reconsideration too late under the local rules, General Rules for the District of New Jersey 121, and therefore denied the motion, except that it remanded the state law claims to the state courts.
On appeal, the Bakers argue that the district court erred in entering summary judgment against them and in denying their motions for reconsideration and to amend their complaint to correct the fictitious names.
I.
The district court did not abuse its discretion in holding that the Bakers were not diligent in seeking to correct the fictitious names in their complaint. However, the Bakers argue that Tiffany and Corey Baker were minors at the time of the events in question and that the statute of limitations has not expired as to them.[2] Though the Bakers’ brief does not supply us with Corey Baker’s birth date, the defendants inform us that Corey Baker reached majority in January 1991, some six months after the events in question, and that the statute of limitations has expired as to him. Once the defendants showed the applicable limitation period had elapsed, Corey Baker had the burden to prove the statute was tolled. Burlington County Country Club v. Midlantic Nat’l Bank South, 228 N.J.Super. 227, 538 A.2d 441, 443 (1987). This he has failed to do. On the other hand, the defendants concede that the statute “may” not have expired for Tiffany Baker, who was born on December 1, 1974. We therefore remand for the district court to determine whether Tiffany Baker should be granted leave under Fed.R.Civ.P. 15 to amend her complaint.
II.
We will not disturb the district court’s refusal to consider the Clementh Griffin affidavit. The Bakers argue that the district court miscalculated the number of business days between entry of its judgment and the motion to reconsider. Even if this is true, the motion to reconsider only reiterated arguments already before the court (except for the motion to remand state law claims, which the court granted). The only filing that would actually help the Bakers was the Griffin affidavit, which was in itself essentially a new motion to reconsider and which was filed well out of time. The district court’s ruling was warranted under the local rules.
III.
The merits of this case involve Fourth Amendment questions of what police may lawfully do with persons who happen to find themselves in the middle of a drug raid, and questions of responsibility under section 1983 of supervisors and municipalities for others’ conduct.
We review the district court’s entry of summary judgment de novo, viewing the evidence in the light most favorable to the nonmovant and giving the nonmovant the benefit of all reasonable inferences. Spain v. Gallegos, 26 F.3d 439, 446 (3d Cir.1994). When the movant has produced evidence in support of his motion, the nonmovants cannot rest on their pleadings, but must come forward with enough evidence to create a material issue of fact. See id.
In order to render Armstrong personally liable under section 1983, the Bakers must show that he participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge of the raid, had knowledge of and *1191 acquiesced in his subordinates’ violations.[3] See Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir.1990); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).
A municipality can only be liable under section 1983 when the municipality itself causes the violation. City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989). The Bakers must show that a policymaker for the Township authorized policies that led to the violations or permitted practices that were so permanent and well settled as to establish acquiescence. Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir.1991), cert. denied, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992); Andrews, 895 F.2d at 1480.
We reject the Bakers’ argument that Monroe Township is liable for the actions of police from other jurisdictions solely by virtue of a failure to train those police. It is unreasonable to expect Monroe Township to retrain officers from the County prosecutor’s office and the D.E.A., and the Bakers have produced no evidence showing that Monroe Township had reason to think such a thing necessary.
The actions the Bakers complain of are best analyzed in four aspects ranging from the least objectionable to the most.
A.
First, we consider Armstrong’s order to the Bakers to “Get down” as Armstrong ran into the Griffin-Woods apartment. Armstrong freely admits that he shouted this order when he saw the Bakers and that the other officers “followed suit,” all shouting the same command. Armstrong also specifically alluded to this as the customary way of doing things: “Just from working over the years, I know that the people I’m passing are going to be secured, again, for their safety as well as our safety.” However, as Armstrong described the practice, it does not violate the Fourth Amendment. Armstrong testified that it was necessary to burst into the house without warning in order to prevent people in the house from destroying evidence. He had a “no-knock” warrant for this very reason. The Bakers were at the doorstep as he ran in. He feared the raid could result in violence, and considered it necessary to get the Bakers down on the ground, partly to protect them from stray gunshots. Armstrong also said that at the instant he encountered the Bakers, he did not know whether the Bakers were coming to or going from the house, nor did he know whether they were the very people whose house he had a warrant to search. There is no doubt but that the Bakers had some relationship to the apartment since Corey was on the steps and the others were right behind. Moreover, Armstrong testified that the presence of citizens standing in the middle of the raid could prevent the police officers from defending themselves, since they would not be able to return fire in the midst of a crowd.
Under these circumstances, it was entirely reasonable to order the Bakers to “get down,” until the situation was under control. Armstrong’s order is justified under two lines of Supreme Court eases. Under Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), during execution of a search warrant, police can detain the occupant of the house they have a warrant to search. This is reasonable to protect the police, to prevent flight, and generally to avoid dangerous confusion: “The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.” Id. at 702-03, 101 S.Ct. at 2594. The dangerousness of chaos is quite pronounced in a drug raid, where' the occupants are likely to be armed, where the police are certainly armed, and the nature of the suspected drug operation would involve a great deal of coming and going by drug customers. In his application for the warrant, Armstrong swore that a concerned citizen advised that “numerous young adults and children” were going to the apartment and he had confirmed this person *1192 ally by surveillance. Armstrong said he did not know whether or not the Bakers were the occupants of the house. Although Summers itself only pertains to a resident of the house under warrant, it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there. See United States v. Moreno, 891 F.2d 247, 249 (9th Cir.1989) (citing both Summers and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
The order to “get down” is also permissible under the line of cases following Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which permit an investigatory stop, not rising to the level of arrest, in situations presenting less than probable cause. Under the Terry cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman’s actions to his reason for stopping the suspect. See United States v. Sharpe, 470 U.S. 675, 682-83, 105 S.Ct. 1568, 1573-74, 84 L.Ed.2d 605 (1985); see generally United States v. Chaidez, 919 F.2d 1193, 1197-98 (7th Cir.), cert. denied, 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991); United States v. Trullo, 809 F.2d 108, 111 (1st Cir.), cert. denied, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). Here, the need to ascertain the Bakers’ identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable to get the Bakers down on the ground for a few crucial minutes. Armstrong’s initial order to “get down” and the other officers’ actions in pushing the Bakers down to the ground did not constitute a Fourth Amendment violation, and therefore did not render Armstrong himself or Monroe Township liable.
B.
Second, we consider the closer question of whether the police detained the Bakers for an unconstitutionally long time. As with the order to “get down,” Armstrong admits that he was aware the Bakers were being detained until they could be identified and that this was consistent with his regular practices. Under Sharpe, 470 U.S. at 685-86, 105 S.Ct. at 1574-75, there is no per se rule about the length of time a suspect may be detained before the detention becomes a full-scale arrest. Instead, the court must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible. Here, the Bakers state they were held a total of about twenty-five minutes, about ten minutes outside and as long as fifteen minutes inside. Significantly, Armstrong did not “holler” out the door for the others to bring the Bakers inside until after the house had been “secured,” meaning that police had located and gained control over the people in the house. Armstrong testified that this took only a “minute or two,” but there is obviously a margin for error here; it would be absurd to expect police in peril for their lives to time their motions with a stop-watch. Given the uncertainty over what would happen until the house was secured, it is not surprising that the police could not begin sorting out who was who for the first ten minutes. After they were brought in the apartment, Tiffany Baker, Inez Baker and Armstrong all estimated that fifteen minutes elapsed before the Bakers left. At least part of that time was taken up with Armstrong delivering an apology and explanation to Mrs. Baker for the detention. (Armstrong said: “It was probably more time explaining what went on in that fifteen minutes of detaining the Baker family than anything else.”) Under Sharpe when “police are acting in a swiftly developing situation ... court[s] should not indulge in unrealistic second-guessing.” 470 U.S. at 686, 105 S.Ct. at 1575. We cannot say that a detention of fifteen minutes time to identify and release a fairly large group of people during a drug raid is unreasonable. Therefore, Armstrong’s admission that the Bakers were detained fifteen minutes inside and some amount of time outside, taken alone, does not render him or Monroe Township liable.
C.
Third, we consider the use of guns and handcuffs. The district court concluded that *1193 the Bakers’ depositions do not indicate Armstrong personally used guns or handcuffs, nor that he directed anyone else to do so. This conclusion is borne out by the record. Armstrong was the senior officer in charge of executing the warrant. Corey Baker testified that as he stood on the doorstep, Armstrong ran past him, into the house. Then, while the Baker family was still outside, others pointed guns at them, pushed them down to the ground and handcuffed them. Other police brought Clementh Griffin and Cheryl Woods outside, but Tiffany Baker could not say whether Armstrong came outside. After the Bakers had been held outside for a few minutes, police brought them into the house. They left all the family but Corey in the kitchen. Police took Corey into the bedroom and searched him, but Corey specifically said Armstrong was not involved in the search. Mrs. Baker said that she saw Armstrong for the first time while inside the apartment and that he came into the kitchen and told the other officers to unhandcuff her and remove the gun that was pointed at her. Tiffany Baker said she never saw Armstrong until they were outside, after they had been released and were leaving. No testimony indicates Armstrong participated personally in the handcuffing or gun-point detention.
There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest. See, e.g., United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir.1989) (use of handcuffs and gun during investigatory stop); United States v. Trullo, 809 F.2d at 113 (use of gun during investigatory stop); United States v. Eisenberg, 807 F.2d 1446, 1451 (8th Cir.1986) (same); United States v. Hardnett, 804 F.2d 353, 357 (6th Cir.1986) (same), cert. denied, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987); see generally United States v. Chaidez, 919 F.2d at 1198. But use of guns and handcuffs must be justified by the circumstances, as in the cases listed. Moreover, we must look at the intrusiveness of all aspects of the incident in the aggregate. In this case, adding up the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the Bakers’ personal security. See United States v. Del Vizo, 918 F.2d 821 (9th Cir.1990) (drawing weapon on cooperative suspect, ordering him to lie prone, and handcuffing amount to arrest). Armstrong himself said that the use of handcuffs would have been inappropriate until there was an arrest, and that the other officers with him work the same way. Here, accepting the Bakers’ testimony, the police used all of those intrusive methods without any reason to feel threatened by the Bakers, or to fear the Bakers would escape. It was dusk but still daylight as Mrs. Baker, Corey and Jacquine, both age 17, and Tiffany, age 15, approached the apartment. Considering the facts in the light most favorable to the Bakers, the appearances were those of a family paying a social visit, and while it may have been a visit to a wayward son, there is simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used. If Armstrong acquiesced in the other officers’ use of guns and handcuffs and if those actions were such as the Bakers describe, the testimony, while conflicting, would support a finding that Armstrong violated the Bakers’ Fourth Amendment rights.
Although Armstrong did not personally use excessive force or order its use, we conclude that there is sufficient evidence to permit an inference that Armstrong knew of and acquiesced in the treatment the Bakers were receiving at the hands of the other officers acting under his supervision. The Bakers said they were handcuffed while outside. Armstrong said he “hollered” out the door of the apartment “to bring those people in.” Tiffany Baker testified that they were brought into the kitchen and her testimony is sufficient to support a finding that the Baker women sat in the kitchen for about ten minutes in handcuffs. Mrs. Baker said a gun was pointed at her head. Corey Baker was taken to a bedroom in handcuffs and was searched. He testified that he remained handcuffed after he had returned to the kitchen and for some five minutes more until he was told it was all right to leave. Tiffany Baker also testified that Corey had his handcuffs on until the Bakers were released and told to go outside. It was a small apart *1194 ment.[4] Armstrong stated that there was an open doorway from the room in which he was speaking to Clementh to the kitchen or dining room where the Bakers were. These few facts, taken together, are sufficient to allow a factfinder to infer that Armstrong was aware of how the Bakers were being treated, but permitted that treatment to continue for some amount of time before he stopped it.
This evidence satisfies at the summary judgment stage the standard our cases require for supervisory liability, that is “actual knowledge and acquiescence.” Rode v. Dellarciprete, 845 F.2d at 1207; Andrews, 895 F.2d at 1478.[5] We believe that actual knowledge can be inferred from circumstances other than actual sight.[6] In this case we think the inference of knowledge could arise from Armstrong’s “hollering” instructions outside to others who were holding the Bakers in handcuffs and at gunpoint; and his presence in a small apartment where the Baker women were being held in one room and Corey Baker was undergoing a protracted search in another. In sum, this evidence is sufficient to withstand defendants’ request for summary judgment.
The Bakers have not shown that Armstrong was a policymaker for Monroe Township, and they have not shown any evidence of Monroe Township practices regarding handcuffing people found at the site of a search or pointing guns at them. Their accounts of what happened in this particular case do not establish a custom or usage. City of Canton, 489 U.S. at 391-92, 109 S.Ct. at 1206. To the extent the record reveals any policy or custom of Monroe Township regarding handcuffs or pointing guns, it exonerates the Township, for Officer Armstrong stated that it would not have been appropriate to handcuff the Bakers, and denied knowing that anyone had handcuffed the Bakers or pointed guns at them. Moreover, he expressed the belief that his approach would have been widely shared by other police. The Bakers have failed to show that Monroe Township caused their injuries.
D.
Finally, we reach the search of Corey Baker and of Mrs. Baker’s purse. Corey Baker said he was taken into a back room and searched. He said: “They searched me, took my wallet out of the back pocket and went all through it, and they made me take off my shoes, checked down inside, checked my socks and stuff.” He said he was forced to take his shirt off and that police went through his pants pockets. Mrs. Baker said her “pocketbook was snatched and emptied out on the ground” while she was still outside.
As we have said, the actions to control the Bakers while the search warrant was executed were justified under Michigan v. Summers and Terry. A search of Corey’s and Mrs. Baker’s persons is not supported by either line of cases. The Supreme Court has recently reiterated that when a protective search goes beyond a search for weapons and becomes a search for evidence, it is no longer valid under Terry. Minnesota v. Dickerson, — U.S. —, —, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). The alleged actions in this case were full-scale searches for evidence, having nothing to do with a limited Terry-frisk, and having no probable cause justification. These allegations constitute Fourth Amendment violations.
*1195 As with the use of excessive force, the key question about the searches is whether Armstrong and Monroe Township were responsible. Armstrong denies that the Bakers were subjected to even a limited Terry-frisk.
Q: Were Mrs. Baker or her children subject to any type of body search while they’re in the house?
A: No, sir.
Q: Would it have been routine that they would have been subject to any type of pat-down search?
A: No, sir.
Q: Would it have been routine for the officers securing them to have searched their poeketbooks?
A: No, sir.
However, as with the handcuffing and use of guns, we conclude that there is a conflict in testimony as to Armstrong’s knowledge about the search of Corey Baker. Corey testified that police took him through the kitchen and the living room to the first bedroom, where they searched him for five to ten minutes. Police went through his wallet, made him take off his shoes and shirt, and checked his socks. Armstrong’s mere presence in this small apartment where Corey Baker was undergoing this protracted search was sufficient to permit an inference that he was aware of the evidentiary search. Therefore, the district court erred in entering summary judgment for Armstrong on this claim.
On the other hand, the search of Mrs. Baker’s pocketbook occurred outside, while Armstrong was inside securing the apartment. We do not believe Armstrong can be held accountable for this search, for the evidence does not support the inference that Armstrong knew what was happening outside the apartment. Consequently, Armstrong was entitled to judgment on Mrs. Baker’s search claim.
As with the handcuffing and use of guns, we see no evidence that Monroe Township expressly or tacitly authorized either of the searches. Therefore, there can be no liability as to the Township.
IV.
We reverse and remand for trial on the issue of whether Armstrong acquiesced in the alleged use of excessive force (in handcuffing the Bakers and pointing guns at them) and in the search of Corey Baker, and for the district court to consider whether Tiffany Baker should be granted leave to amend her complaint under Rule 15. In all other respects, we affirm the judgment of the district court.

. The warrant consisted of a form authorizing search of: "the (x) premises (x) person (x) vehicle described, below " (emphasis added). Though x's were filled in each of the three blanks, the space for the promised description contained only an identification of the premises to be searched and mentioned nothing about any persons. Although the dissent, infra at 1197-98, considers this a warrant for search of specified persons, the only common-sense interpretation of the document is that no one ever bothered to complete it to include specified persons as well as premises. This flawed document does not *1189 demonstrate that the magistrate determined search of any particular person to be justified.
The "description below” referred only to an apartment in a three story wood frame residence. There is no description, general or specific, of any person as in the warrant we considered in United States v. Ferrone, 438 F.2d 381, 389 (3d Cir.), cert. denied, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971). Nor did the language in the description refer to a place and any or all "persons found therein” as did the warrants before the courts in State v. Sims, 75 N.J. 337, 382 A.2d 638, 642 (1978), and State v. De Simone, 60 N.J. 319, 288 A.2d 849, 850 (1972). The Fourth Amendment requires that the warrant particularly describe the place to be searched and the persons to be seized. The face of the warrant demonstrates its failure to meet the requirement of the Fourth Amendment. The dissent engages in a lengthy interpretation of the warrant to find authorization for a search of persons found on the premises. The dissent then proceeds to analyze Sims and De Simone, cases which specifically referred to persons on the premises, to include a question of probable cause. This elaborate interpretation and analysis and the length to which the dissent goes in developing it simply point up the inadequacy of the warrant to describe any person generally or specifically. Having said as much, we need not speculate further as to whether the dissent's interpretation would cover not only persons found on the premises, but those outside the premises and on the sidewalk and steps leading into it. It is also evident that the dissent makes its interpretation and bases its analysis on the facts taken in the light most favorable to the party moving for summary judgment rather than the non-movant, contrary to the constraints we have referred to that guide us in reviewing an order granting summary judgment. Infra at 1197-98.

. The evidence also indicates Jacquine was a minor at the time of the events, but the plaintiffs do not mention this.

. It is also possible to establish section 1983 supervisory liability by showing a supervisor tolerated past or ongoing misbehavior, see e.g. Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 724-25 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); since the facts of this case do not implicate such a theoiy, we need not belabor it.

. Armstrong stated that the apartment had only three rooms and a bath. Corey Baker’s testimony indicates that there was a living room, kitchen, and more than one bedroom.

. We note that other circuits have developed broader standards for supervisory liability under section 1983. For example, the Eighth Circuit has held that "actual knowledge is not an absolute prerequisite” and that "reckless disregard on the part of a supervisor will suffice.” Hall v. Lombardi, 996 F.2d 954, 961 (8th Cir.1993) (quoting Howard v. Adkison, 887 F.2d 134, 138 (8th Cir.1989)), cert. denied, — U.S. —, 114 S.Ct. 698, 126 L.Ed.2d 665 (1994). See Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir.1994); Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir.1986).

.Although bound by Third Circuit precedent, we believe that the dissent takes too narrow a view of actual knowledge, apparently contending that Armstrong had to actually see the activities to have actual knowledge of them.