FILED
United States Court of Appeals
Tenth Circuit

March 10, 2023

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

BRETT HEMRY; GENALYN HEMRY,
individuals and as next friends of F.M.H., a
minor child,

      Plaintiffs - Appellees,

v.

BRADLEY M. ROSS; MEHRAN
AZIZIAN, Agents and Servants of the
National Park Service, United States
Department of Interior,

      Defendants - Appellants,

and

ROBERT R. COOKE; BRETT M.
TILLERY, Agents and Servants of the
Sheriff of Park County Wyoming; JOHN
DOES 1-10,

      Defendants.

No. 22-8002

_____

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:21-CV-00136-ABJ)**

_____

Anne Murphy (H. Thomas Byron III, Attorney, Appellate Staff, Civil Division; Brian M.
Boynton, Principal Deputy Assistant Attorney General; L. Robert Murray, Unites States
Attorney; and Jeremy A. Gross, Assistant United States Attorney, with her on the briefs),
United States Department of Justice, Washington, DC, for Defendants-Appellants.

Robert T. Moxley, Robert T. Moxley, P.C., Cheyenne, Wyoming, for Plaintiffs-Appellees.

_____

Before **TYMKOVICH**, **KELLY**, and **MATHESON**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

Two Yellowstone Park rangers received an alert that a park employee had spotted Michael Bullinger, a fugitive wanted for allegedly shooting and killing three women in Idaho. The report said Bullinger was leaving the park in a white Toyota with a Missouri license plate. But the employee was mistaken—he had instead spoken with Brett Hemry, a man on vacation with his wife, Genalyn, and his seven-year-old daughter.

The rangers spotted the white Toyota leaving the park and trailed it. Mr. Hemry noticed the rangers and pulled over near a campground sixteen miles east of the park entrance. Waiting for reinforcements, the rangers exited their patrol car and from a distance held the Hemrys at gunpoint until county law enforcement arrived. Once county law enforcement arrived, the rangers moved Mr. and Mrs. Hemry to separate police cruisers. After examining Mr. Hemry's driver's license, they set the couple free.

The Hemrys sued the rangers under 42 U.S.C. § 1983 for violating their Fourth Amendment rights. On a motion to dismiss, the district court denied the rangers qualified immunity for Mrs. Hemry's false-arrest claim and for Mr. and Mrs. Hemry's excessive force claims. The rangers appealed.

We reverse.  In the fact-specific context here, the law does not clearly establish this investigative stop amounted to (1) an arrest of Mrs. Hemry without probable cause, or (2) excessive force against the Hemrys.

## I. Background

We assume the truth of the following factual allegations contained in the complaint for the purposes of this appeal.  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Michael Bullinger disappeared after allegedly murdering three women in Idaho. A few weeks later, Brett Hemry, Genalyn Hemry, and their daughter traveled on vacation to Yellowstone Park.  A park employee observed the Hemrys leaving Yellowstone through the east entrance.  He mistakenly informed park authorities that he had spoken with Bullinger.

At 9:11 a.m., the Park Service alerted the Park County Sheriff's Department to "be on the lookout" for a white Toyota passenger car bearing the Hemrys' license plate number.  In response, the Sheriff's Department dispatched two deputies in separate vehicles to the east entrance.

The defendant rangers, Bradley Ross and Mehran Azizian, spotted the Hemry vehicle around 10:00 a.m. and followed it.  Mr. Hemry saw the rangers trailing him, so he pulled over near a campground.  The rangers pulled in front of the Hemry car, exited their vehicle, and held the Hemrys at gunpoint.  The rangers used a loudspeaker to instruct Mr. Hemry to throw his keys out of the car.  They ordered the family to place their hands on the car ceiling.  The Hemry family complied as other rangers arrived.

Around 10:20 a.m., the first deputy arrived. The second arrived about 10 minutes later. They joined the rangers in pointing guns at the car. An unidentified officer ordered Mr. Hemry out of the car, handcuffed him, and placed him in a police vehicle. The officers did the same with Mrs. Hemry.

After being placed in separate patrol cars, both Mr. and Mrs. Hemry remained detained in this fashion for about twenty minutes. Then the officers asked Mr. Hemry for identification, which he produced. They realized he was not Michael Bullinger. An officer explained to Mr. Hemry that they were on the lookout for a murder suspect and displayed a picture of Bullinger, who shared Mr. Hemry's light-colored hair. The officers let Mr. and Mrs. Hemry return to their vehicle and they left the campground with their seven-year-old daughter.

The Hemrys sued the rangers for false arrest, false imprisonment, and excessive force under § 1983. On the rangers' motion to dismiss, the district court denied the rangers qualified immunity on some counts and granted it on others. Relevant here are Mrs. Hemry's false arrest claim and Mr. and Mrs. Hemry's excessive force claims.

The district court concluded the complaint established the rangers arrested Mrs. Hemry without probable cause and no reasonable officer would have thought probable cause supported the arrest. It denied the rangers qualified immunity. The court also concluded, on the facts alleged, the officers acted with excessive force. The court determined the rangers had no reason to point guns at the Hemrys and denied qualified immunity.

4

## II. Analysis

Both denials of qualified immunity arise on appeal from the denial of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, which we review de novo. *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal citations and quotation marks omitted). This is because "at [the motion to dismiss] stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (internal citations and quotation marks omitted).

When a defendant claims qualified immunity, the plaintiff must show "(1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal citations and quotation marks omitted). "Thus, [the Supreme Court has] stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id.* at 590 (internal citations and quotation marks omitted).

5

If the plaintiff fails to satisfy either prong of qualified immunity, his suit fails. Accordingly, we have "discretion to decide the order in which these two prongs should be addressed," and need not address both. *Soza*, 13 F.4th at 1099.

Applying these standards, we conclude that the law was not clearly established for either claim.

### A.     *Mrs. Hemry's false arrest claim*

We begin with Mrs. Hemry's false arrest claim. She alleges the rangers did not merely detain her but arrested her without probable cause. The district court agreed. But we conclude the law did not clearly establish that the investigatory detention escalated into an arrest.

"This Court has recognized three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions"—*Terry* stops—"which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018) (internal quotation marks omitted).

We conduct a fact-intensive inquiry to distinguish between arrests and *Terry* stops. Our inquiry considers both the officers' forceful measures and the detention's length. When officers use "firearms, handcuffs, and other forceful techniques," *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (internal citations and quotation marks omitted), a *Terry* stop escalates into an arrest unless "the circumstances

6

reasonably warrant such measures," *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal citations and quotation marks omitted). "The key inquiry is whether the forceful measures were reasonable, and the guiding standard is objective: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution [to believe] the action taken was appropriate?" *Soza*, 13 F.4th at 1101 (internal citations and quotation marks omitted). We similarly evaluate length given the "purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

At the outset, we find that the rangers had reasonable suspicion to stop Mrs. Hemry. Reasonable suspicion "requires considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch." *Melendez-Garcia*, 28 F.3d at 1051 (internal citations and quotation marks omitted). Even so, it "is not, and is not meant to be, an onerous standard." *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011) (internal citations and quotation marks omitted). "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (internal citations and quotation marks omitted). Instead, he must only maintain a "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Cortez*, 478 F.3d at 1115 (internal citations and quotation marks omitted).

The rangers easily cleared the reasonable suspicion hurdle. A park employee had contemporaneously reported that the man driving alongside Mrs. Hemry was a fugitive

7

murderer. The rangers had no reason to doubt that representation. *See United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (finding that an anonymous tip from an unknown caller in an unknown location gave rise to reasonable suspicion that a suspect possessed a firearm). While the employee's tip singled out Mr. Hemry, the rangers could not reasonably silo Mrs. Hemry from that determination. They had every reason to suspect that a man like Michael Bullinger would drive a well-defended vehicle, and that an unidentified passenger might not simply be along for the ride. The rangers had more than a hunch that Mrs. Hemry was or could be a collaborator or a hostage.

Mrs. Hemry claims the rangers' use of firearms to detain her was clearly unreasonable and escalated the detention into an arrest requiring probable cause. We disagree.

In like cases, we have found a similar show of force reasonable. For example, in *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982), officers approached a vehicle in search of a murder suspect. The officers knew the suspect kept firearms at his suspected residence, "thus confirming the suspicion that he, *and others he was with*, might well be armed." *Id.* at 1272 (emphasis added). The officers ordered the driver and his passengers out of the vehicle and pointed shotguns at them while verifying their identities. We found that, despite the officers' forceful measures, they did not arrest the driver and his passengers because "the use of guns in connection with a [*Terry*] stop is permissible where the police reasonably believe they are necessary for their protection." *Id.* at 1273.

Likewise, the rangers reasonably suspected they were confronting a fugitive triple-murderer accompanied by an unknown passenger. To be sure, the circulated report did

not flag the presence of an adult passenger.  But the report also did not indicate that Bullinger travelled alone.  And given the matching vehicle and license plate number, it surely would have been unreasonable for the rangers to conclude they were free from danger.

Or consider *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993).  There, officers searched a shed on a rural property after finding signs of marijuana growth.  Two officers on perimeter control learned that other officers had found a pistol and shotgun on the property.  They subsequently witnessed a car approach the shed and divert its course after spotting the police vehicles.  The perimeter officers, guns drawn, ordered the driver out of the car.  We decided that "although effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios, it was not unreasonable under these circumstances."  *Id.* at 1463.  After all, the officers knew that guns had been found on the property, and that "fact alone justifie[d] any concern the officers had for their personal safety."  *Id.*

In *Perdue*, we approved a similar show of force on less alarming facts.  The rangers had as much—if not more—reason to suppose that the Hemry vehicle harbored dangerous weapons.  The rangers had a clear and pressing interest in preventing Mrs. Hemry from "obtaining weapons which might have been in the car or on [her] person." *Id.*  Indeed, "the Supreme Court has observed it is 'reasonable for passengers to expect that a police officer at the scene of a[n] . . . investigation will not let people move around in ways that could jeopardize his safety."  *United States v. Gurule*, 935 F.3d 878, 883 (10th Cir. 2019) (quoting *Brendlin v. California*, 551 U.S. 249, 258 (2007)).  Because

Mr. Hemry posed a plain, deadly threat, the rangers' use of firearms on Mrs. Hemry reasonably vindicated their well-established safety interest.

The district court found that our decision in *Maresca v. Bernalillo County*, 804 F.3d 1301 (10th Cir. 2015), requires a different outcome. There, officers at gunpoint ordered a family out of a suspected stolen truck. The officers forced the family of two parents and three minor children to exit the vehicle and lie face down on the highway. The officers first removed the parents, who pleaded with the officers that there had been a mistake, that they should check the father's license, and that there were children and a dog in the car. Even though one officer on the scene considered the situation "a little weird," the officers ignored the parents' repeated pleas to recheck whether the vehicle was in fact stolen and proceeded to order the three children out one-by-one. *Id.* at 1305. The officers then handcuffed each family member (except the youngest) and locked them in separate patrol cars, keeping their weapons trained on the family throughout despite full compliance with their orders. We found the forceful measures unnecessary primarily because the officers had no reason to believe the family possessed firearms.

The facts surrounding the rangers' stop differ materially. The *Maresca* officers threatened deadly force against a family (wrongly) suspected of occupying a stolen car. In *Maresca*, there was nothing about the circumstances of the underlying crime which indicated to officers that the occupants of the car may be armed. Here, the rangers had strong reason to believe the occupant of the vehicle they approached was dangerous, as they reasonably believed they were approaching a fugitive triple-murderer and, potentially, his unidentified accomplice or hostage.

10

Unlike the officers in *Maresca*, the rangers could not be sure that the danger had abated when the Hemry car stopped. That brought the danger level in this situation closer to the circumstances recounted by *Perdue* and *Merritt* than to the traffic stop in *Maresca*. The level of force *Perdue*, *Merritt*, and this case "reasonably warrant[ed]" differs from *Maresca* accordingly. *Melendez-Garcia*, 28 F.3d at 1052 (internal citations and quotation marks omitted).

Mrs. Hemry also contends that the detention's duration escalated the stop into an arrest without probable cause. We do not detect any such constitutional infirmity.

An officer can detain a suspect without arresting him. But clearly established law instructs that "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In other words, we must consider "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685. In doing so, the law instructs us to evaluate the length of a stop with an eye toward "common sense and ordinary human experience." *Id.* As with the force inquiry, our evaluation is fact-intensive, and in the qualified immunity context, we look for "a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Wesby*, 138 S. Ct. at 590 (internal citations and quotation marks omitted).

The law did not clearly establish that Mrs. Hemry's detention took longer than "reasonably needed to effectuate [the] purposes" of the stop. *Sharpe*, 470 U.S. at 685.

11

Fifty minutes is a long time to be detained, whether at gun point or in a police car.[1]  But an evaluation of the reasonableness of a detention's length is not an exercise in counting minutes.  Instead, we probe the factual context and the detention's "underlying justification."  *Royer*, 460 U.S. at 500.  That inquiry leads us to conclude that the officers would not have been on notice that they were violating Mrs. Hemry's rights by detaining her to wait for backup and identification.

Two facts inform our conclusion.  First, the two rangers spent most of the stop waiting for backup.  In a stand-off with a man reasonably suspected of triple homicide—accompanied by at least one unidentified passenger—we cannot find that the rangers clearly acted unlawfully by waiting for additional officers.  *See United States v. Villa-Chaparro*, 115 F.3d 797, 802–03 (10th Cir. 1997) (finding that an officer acted reasonably by detaining defendant for "an additional thirty-eight minutes while he waited for the canine unit to arrive").  The law did not forbid the rangers from waiting until they clearly and meaningfully outnumbered the potential threats before moving the investigation along.  *See Terry v. Ohio*, 392 U.S. 1, 24 (1968) ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous . . . it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to . . . neutralize the threat of physical harm.").

---

[1] The length inquiry is always fact-bound, so it is no surprise that we have found a fifty-minute stop of reasonable length before.  *See, e.g.*, *United States v. Cervine*, 347 F.3d 865, 872–73 (10th Cir. 2003) (finding that a fifty-minute stop did not violate the Fourth Amendment).  *Per se* rules do not have a place in such an analysis.

Second, even after the officers moved the Hemrys to separate vehicles, it would not have been clear that the danger had passed. An officer could reasonably suspect that an unrecognized threat remained hiding in the vehicle, especially after discovering an unexpected passenger, Mrs. Hemry, accompanying the suspect.[2] *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("[T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer."). It would not have been clearly unlawful for the rangers to take 20 minutes to "dispel their suspicions" that some unrecognized danger lurked in the car before turning to identify the apprehended suspects.[3] *Sharpe*, 470 U.S. at 686; *see also Terry*, 392 U.S. at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."). Nor was it problematic for the rangers to hold Mrs. Hemry for that long, even though Mr. Hemry was ostensibly the prime suspect. *See Gurule*, 935 F.3d at 883

---

[2] And indeed, the Hemry daughter remained in the vehicle, and the complaint alleges that the officers kept a gun trained on her for the duration of the entire stop—although it is unclear whether they spotted her, or simply kept a gun trained at the vehicle.

[3] Similarly, we find the Hemrys' reliance on *Haynes v. Minnehan*, 14 F.4th 830 (8th Cir. 2021), misplaced. There, the Eighth Circuit found that police officers illegally detained a suspect by keeping him handcuffed for five minutes after determining he posed no threat. With no "specific facts supporting an objective safety concern," the seizure did not "relate[] in scope to the circumstances which justified the interference in the first place." *Id.* at 836–37 (internal quotation marks omitted). The Hemrys argue that the rangers' safety concerns similarly dissipated once they had the Hemrys at gunpoint. We disagree. The *Haynes* driver had been removed from his vehicle and had been frisked. The rangers, by contrast, may have had the family at gunpoint, but they reasonably believed they were detaining a vehicle and its passengers with some potential involvement in a string of murders; so they sat at a distance, and, for a time, the Hemrys remained partially obscured in the vehicle.

("[T]he Court has further acknowledged that passengers may be detained *for the duration* of an otherwise-valid traffic stop . . . .").

Under the relevant case law, the rangers did not obviously use too much force in detaining Mrs. Hemry, nor did they obviously detain her for too long. As a result, the rangers would not have been on notice that they conducted an arrest rather than a *Terry* stop. And because we have no trouble finding that the rangers possessed reasonable suspicion to conduct the stop, we find the officers are entitled to qualified immunity as to Mrs. Hemry's alleged arrest.

### B.     *Mr. and Mrs. Hemry's excessive force claims*

The Hemrys also contend the rangers used excessive force during the detention.

We assess excessive force claims under a "reasonableness" standard. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 398 (1989). "That perspective includes an 'examination of the information possessed by the officers.'" *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case . . . ." *Graham*, 490 U.S. at 396. This includes the three *Graham* factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

14

But a qualified immunity excessive force case does not always call for a *Graham* analysis. The Supreme Court has observed that "general statements of the law are not inherently incapable of giving fair and clear warning to officers," and "*Graham* do[es] not by [itself] create clearly established law outside an obvious case." *White v. Pauly*, 580 U.S. 73, 80 (2017) (internal quotation marks omitted). We will assume for the sake of argument that the *Graham* factors are met here and move to consider whether "existing precedent . . . placed the . . . constitutional question beyond debate." *Id.* at 79 (internal quotation marks omitted).

We consider first whether the law clearly established that the rangers used excessive force as to both Mr. and Mrs. Hemry. We recognize that what constitutes a reasonable use of force likely differs between the spouses—Mr. Hemry was suspected of murder, while Mrs. Hemry could have been a suspected accomplice. But even so, the analysis as to each Hemry is not easily untangled from the other. Given the apparent relationship between each Hemry, the rangers' response to Mrs. Hemry is necessarily colored by the facts they thought they apprehended about Mr. Hemry. It is the Hemrys' burden to identify a case that establishes that "every reasonable official" would have understood that pointing guns at both Hemrys constituted excessive force as to either or both given the apparent or reasonably suspected relationship between the two individuals. *Creighton*, 483 U.S. at 640.

The Hemrys point to a handful of cases that they argue put the constitutional question beyond debate. For example, they cite to a Third Circuit case, *Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir. 1995). Importantly, *Baker* is not an excessive force

15

case; instead, the court considered whether a reasonable jury could find supervisory liability for an officer where other officers were accused of using excessive force. In dicta, the court suggested that using handcuffs and pointing guns at a family approaching an apartment subject to a drug warrant was "a very substantial invasion" of that family's security, as the police had no "reason to feel threatened by the [family]" or "fear the [family] would escape." *Id.* at 1193. Besides the relevant language appearing in dicta, *Baker* does not clearly establish that the rangers acted with excessive force because in *Baker*, "there [was] simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." *Id.* Not so where the rangers reasonably suspected that they were approaching the subject of a manhunt and his unidentified passenger.

The Hemrys also point to a Ninth Circuit case, *Tekle v. United States*, 511 F.3d 839 (9th Cir. 2007). There, the court denied qualified immunity for officers who handcuffed and pointed guns at a fully compliant, unarmed eleven-year-old boy who was lying face down on the ground. It held that a reasonable officer would have known that such a use of force was excessive. *Id.* at 848. We decline the Hemrys' invitation to draw a parallel between the eleven-year-old boy and the Hemrys. The Hemrys parked at some distance and the rangers could not be sure what weapons hid at the Hemrys' feet or sat on the console. A Ninth Circuit case does not suffice to put the rangers on notice that they used excessive force.

The district court primarily relied on two Tenth Circuit cases to reach a contrary conclusion. First, the court again tapped *Maresca*. The court emphasized that in

16

*Maresca*, the officers pointed guns at a family despite the family's full compliance—a fact we found relevant in evaluating whether there was a live excessive force claim on summary judgment. 804 F.3d at 1313–15. The court tied this language to *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), wherein we denied qualified immunity for officers who held a group at gunpoint. There, we similarly highlighted the unreasonableness of holding a group "directly at gunpoint after they had completely submitted" to the officers' "initial show of force." *Id.* at 1197. The district court read these cases together, and found that here, as in *Maresca* and *Holland*, the rangers had full control over the situation and were therefore unjustified in holding the Hemrys at gunpoint for as long as they did.

We find the cases distinguishable. In *Maresca*, the officers had pulled over and pointed guns at a family after misidentifying the family truck as a stolen vehicle. And in *Holland*, the officers employed a SWAT team to execute a warrant for a man's arrest on misdemeanor assault and reckless endangerment charges. In the process, "the SWAT deputies held each of the plaintiffs-appellees [including children] at gunpoint, initially forcing several of them to lie down on the ground for ten to fifteen minutes. . . ." *Holland*, 268 F.3d at 1192.

The facts here do not clearly direct officers to take a different course based on these cases. In neither *Maresca* nor *Holland* did the officers have reason to anticipate deadly force from the plaintiffs. Those officers made outsized responses. By contrast, the rangers reasonably believed they were approaching a man evading arrest for triple homicide. To be sure, they also lacked information concerning Mrs. Hemry's potential

17

dangerousness. But whether she was a co-conspirator or a hostage, the rangers could reasonably fear that she would act in Mr. Hemry's interest and could have access to any weapons Mr. Hemry might have possessed. And, again, Mr. Hemry was wanted for murder: it was reasonable to suspect that his car harbored weapons. The rangers' reaction here was proportional, and neither the district court nor the Hemrys cite any case law that suggests otherwise.

Perhaps *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007), comes closest to establishing that, at the very least, the rangers subjected Mrs. Hemry to excessive force. In *Cortez*, a sheriff's department received a late-night tip indicating that a young girl might have suffered from sexual abuse at the hands of her babysitter's husband, Mr. Cortez. Officers quickly took off to the Cortez residence. Mr. Cortez opened the door for the police, who ordered him out of his house, handcuffed him, and placed him in a patrol car. Mrs. Cortez—the babysitter—heard the commotion. She witnessed the officers placing Mr. Cortez in the patrol car and rushed back to her bedroom to make a phone call. But before she could, an officer seized her arm and physically escorted her to another patrol car.

We found that Mrs. Cortez suffered such force that a reasonable jury could find that the officers violated her constitutional rights. We emphasized that Mrs. Cortez "was never the target of the investigation," and "no evidence suggests that a reasonable law enforcement officer would suspect that she posed a threat." *Id.* at 1130. After all, "she was unarmed and gave no indication of flight." We concluded that the law was clearly established that officers involved could "use only as much force as was necessary to

18

secure their own safety and maintain the status quo," and here, "the force used . . . bear[ed] no relationship to those purposes." *Id.* at 1131.

*Cortez* serves as a reminder that Mrs. Hemry's mere proximity to a criminal suspect did not, as a rule, make her so dangerous as to authorize the same degree of force to which the rangers subjected Mr. Hemry. But we again find the case distinguishable. The *Cortez* officers did not have a reason to suspect that either Mr. or Mrs. Cortez posed an immediate threat. Mr. Cortez's alleged crime, though heinous, did not suggest that he or any potentially sympathetic party (like Mrs. Cortez) would meet the police presence with violence, especially after he was restrained. But as discussed above, it would have been unreasonable for the officers to discount Mrs. Hemry as a dangerous threat merely because she was clearly not Michael Bullinger. Mrs. Hemry appeared as an unknown quantity beside a suspected dangerous criminal, her body partially obscured by a vehicle at a distance. *Cortez* did not clearly require the rangers to point guns *only* at Mr. Hemry for their protection—assuming such precision was at all times even possible.

The plaintiffs have not met their burden of demonstrating that the law clearly established the rangers acted with excessive force as to either Hemry. And we cannot "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Wesby*, 138 S. Ct. at 590. Accordingly, the officers are entitled to qualified immunity.

## III. Conclusion

We reverse the district court denying qualified immunity.

19